**MURPHY v. CADY et al.**

District Court, D. Maine, S. D.

Dec. 11, 1939.

Nathan W. Thompson and Richard S. Chapman, both of Portland, Me., for plaintiff

Richard Wait, of Boston, Mass., and Verrill, Hale, Dana & Walker, of Portland, Me. (Robert Hale, of Portland Me., of counsel), for defendants.

PETERS, District Judge.

The plaintiff is a small securities broker in Portland. The defendants, fifteen in number, constitute a brokerage firm in Boston with which the plaintiff did most of his purchasing business for several years.

The writ, dated October 6, 1937, after amendment, contains four counts; three

under the Securities Act of 1933, 15 U.S.C. A. § 77a et seq., and one a common law count for deceit, all on the same facts, claiming damages for false representations in the sale of a block of stock in early March, 1937.

The defense is a general denial with requests for rulings directed toward the points relied upon, principally as follows:

(1) That the count for deceit at common law is not sustained by the evidence;

(2) That Section 12, giving the right of action, does not apply to a broker who acts as such only and who does not sell his own stock, and

(3) That the defendants, in the sale of stock, did not act as principals and consequently did not "sell" the security and cannot be held liable under the counts based upon the Securities Act, even if false representations were made.

The case was tried without a jury.

From the somewhat conflicting evidence I consider the following facts established:

The stock sold to the plaintiff by the defendants—acting either as brokers or owners—consisted of 1,700 shares of South American Utilities Corporation common, and the price paid was $4.50 per share. The business was wholly done in behalf of the defendants by Francis E. Lynch, so-called head trader of the firm. Knowing that the plaintiff, Murphy, was looking for a stock with some speculative possibilities to sell to his customers for a profitable rise, Lynch, from the office of the firm in Boston, called Murphy in Portland by telephone and informed him that the firm would soon be in a position to sell him or obtain for him such a stock, as they had in mind a certain company they were investigating.

Later on, Lynch by telephone disclosed to Murphy the name of the company, and, in the course of various telephone conversations, made the statements claimed by the plaintiff to be false representations.

At this point it is enough to say that in numerous telephone conversations between Boston and Portland, Lynch, for his firm, solicited from the plaintiff an offer to buy the stock mentioned, and as a result of Lynch's solicitations and representations the plaintiff bought the stock, paying the price named and a brokerage commission of four cents a share.

The plaintiff made no inquiries elsewhere about the stock, which was not listed on any exchange, and no investigation, except to find that it was not mentioned in Moody's Manual. He explains the fact that he invested a large part of his small capital in this stock, without seeing a financial statement or any statement of earnings, by saying that he had great confidence in the defendant firm, and relied wholly on the statements made by their agent Lynch.

As soon as the plaintiff received the stock he sold most of it in small lots, but soon thereafter received information which caused him to think the stock was not a proper one to sell to his customers, and he immediately bought back all the stock he had sold without loss to the purchasers. The stock was actually without substantial value at any time.

After taking the stock back the plaintiff made the usual tenders and demands on the defendants, without result, and this suit followed.

The defendants deny that any false representations were made by their agent Lynch. If their position is correct—if plaintiff has not proved by a clear preponderance of the evidence in a case of this nature that false representations were made—he cannot and should not prevail from any point of view or on any counts in his writ. So the question of false representations is fundamental.

On this point the plaintiff himself testified with positiveness and apparent sincerity as to what Lynch said to him in the numerous telephone conversations about this stock, being, in effect, that the South American Utilities Corporation was a "nice little operating company", managed by the Chase Bank of New York and practically controlled by that bank; that the earnings of the company were twenty-five to thirty cents a share; that the Chase Bank had refused an offer of $8 a share and was holding its stock for $12; that the South American laws and regulations, as well as the exchange situation, were favorable; and that this information was obtained by one of the partners of the defendants from an officer of the South American Utilities Corporation while in Florida.

The testimony of the plaintiff as to the statements of Lynch is corroborated by one of his salesmen, Rand, who was to handle some of the stock for the plaintiff, and who said he thought they ought to have more information about it before proceeding to sell. Whereupon Murphy called Lynch by telephone and put Rand on the line, saying to Lynch "Tell Mr. Rand the story that you

told me"; whereupon, as Rand testified, Lynch repeated substantially the same facts he had given to Murphy, repeating the statements, among others, that the Chase Bank, owning a large amount of the stock, had refused $8 a share and wanted $12, and that the earnings were between twenty and thirty cents a share. The stories of Murphy and Rand are also corroborated to some extent by other witnesses and in other ways.

Lynch, on the stand, did not deny that he gave Murphy the information substantially as testified to by him, nor that it was false in the most important respects; but said that he himself got the information from one E. E. Smith, a small trader in New York, from whom Lynch testified he obtained the stock, and that he told Murphy that Smith was the only source of his information.

Both Murphy and Rand deny that Smith's name was mentioned in their conversations with Murphy at any time when Murphy had the purchase under consideration.

From all the testimony on this subject it is impossible to believe that Lynch simply passed on to Murphy the statements of Smith without recourse, so to speak. Murphy did not know Smith and had never heard of him. It is conceivable that Murphy, a broker himself of some years experience, would invest his money relying on the statements of a highly reputable firm with which he had had satisfactory dealings for years, but it is highly improbable that he would do so on nothing but secondhand statements attributed to an unknown small trader in New York who was selling the stock.

The only reasonable conclusion from the evidence is that Lynch, in his conversation leading up to the sale of the stock, put himself and his employers behind the statements concerning it, and gave them currency on the responsibility of the firm—wherever the information originated—and that Murphy had a right to so understand.

As to Lynch's knowledge of the falsity of the statements, we have his testimony that he believed them. That may be so, although another member of his organization referred to the stock as "junk" at about the same time it was sold.

"It is not necessary to prove that the person making a false statement knew it was false in order to sustain an action for, or a defense of, fraud. If one reck-lessly states as of his own knowledge material facts susceptible of knowledge, which are in fact not true, even though he may believe them to be true, it may amount to fraud, if the statements were made to induce another person to act upon them, and he does act upon them, believing them to be true." Richards v. Foss, 126 Me. 413, 139 A. 231, 232. But, in any event, under Section 12 of the Act, 15 U.S.C.A. § 77*l*, the seller has the burden of proving that in the exercise of reasonable care he could not have known of the falsity. This has not been proven, nor could it be, in view of the fact that if Smith called up Lynch, as he said was the case, and made the statements concerning the stock, it would have been perfectly easy and a matter of only a few minutes for Lynch to have talked with the Chase Bank, whose deposition is in the case, and found out immediately that the statements were untrue; and it would have been only common prudence to do so, especially as Smith, to Lynch's knowledge, was the owner of the stock he was recommending.

Having found that the sale was induced by representations which included false material statements, it is necessary to consider whether the facts permit a recovery under any counts of the writ.

I do not think that the count for deceit can be sustained on the evidence. One of the essential elements of such an action is the allegation and proof that the plaintiff did not know the representations to be false "and by the exercise of reasonable care could not have ascertained their falsity". Crossman v. Bancon & Robinson Co., 119 Me. 105, 109 A. 487, 489; Byrne v. Greene, 1 Cir., 70 F.2d 137.

If the plaintiff was satisfied to buy the stock on representations alone, that was his affair; but when he sues for being defrauded he must show a compliance with the obligation imposed on him by law to use ordinary prudence in the transaction. What is ordinary, reasonable care and prudence, under the circumstances present, is a matter of judgment; but it would seem that a broker, a specialist in such matters, who bought unlisted stock in a company he had never heard of, without seeing a financial statement, a report of earnings, or any statement issued by the company, and who made no attempt to ascertain the truth of important statements about the management of the company and prices offered and refused for the stock, or did

anything whatever to gain other information except to find that the company was not mentioned in a standard financial manual—could hardly be said to be exercising that degree of care which an ordinarily prudent man would exercise under the circumstances. A securities dealer has at hand special facilities for obtaining information about stocks which he uses for obtaining information for the benefit of his customers every day. He can use them for himself as well, and, not doing so, and suffering thereby, he cannot recover in an action at common law for deceit.

The defendants strenuously contend that the statute applies only to persons acting as principals selling their own property, and that they are not in that category.

For the benefit of the defendants I will say that the evidence is not sufficient to satisfy me that the defendants owned this stock and sold it as principals. I hold that the plaintiff can recover only in case Section 12 of the Securities Act of 1933 applies to brokers when selling securities owned by other persons.

Among other reasons for their contention the defendants say that the language of the Section shows that only principals are referred to; that "selling" imports ownership, and that creating a liability "to the person purchasing such security from him" refers to a transaction involving a transfer of title from one person to another.

I do not find any decisions on this question nor any reference to this particular point in the records of the Congress when the legislation was pending, but a consideration of the language in other sections of the Act, together with the known purpose of Congress in passing it, leads to the conviction that the narrow construction contended for by the defendants cannot be upheld.

As the section expressly applies to *"any person* who * * * sells a security" (such as this), it is apparent that brokers as a class are not excepted from its provisions. It is only a question whether the brokers here (through their agent) have done a thing which under certain circumstances gives rise to the statutory liability.

The section refers only to a person who "sells a security". Did the defendants "sell" the security in question to the plaintiff, as the word is used in the Act? It is not necessary nor helpful to consult the books for the meaning of the word, because it is defined in the Act and given a special significance. As used there it includes activities which may be carried on by persons other than the owners of the security itself. Section 2(3), 15 U.S.C.A. § 77b(3), provides that "The term 'sale', 'sell', 'offer to sell', or 'offer for sale' shall include every contract of sale or disposition of, attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."

By virtue of the definition of the word "sell" in Section 2(3) and the language of Section 12(2) creating the civil liability, and putting the two together, the Act provides (turning the nouns into verbs), that any person who attempts or offers to dispose of, or solicits an offer to buy a security or interest in a security, for value, "by the use of any means or instruments of transportation or communication in interstate commerce * * * which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him * * *".

It should be noted that the statute, which applies only to inter-state communications, relieves the purchaser from the common law obligation of using reasonable prudence himself and puts the burden on the seller to prove that he did not know and could not reasonably have known that his material statements were false.

Whether the seller, being a broker, himself owns the security, or whether he is acting as the agent for the owner, or for the purchaser, or for both, is immaterial. If, in the course of an attempt to dispose of, or solicitation of an offer to buy a security, he makes false statements under circumstances referred to in Section 12, the purchaser is given a right of action to recover any damages he has suffered on account of the false representations.

The ordinary brokerage transaction, merely the execution of orders to buy or sell, does not appear to be affected by Section 12. It is the extra-brokerage activity—solicitations accompanied by false statements—which are made the basis for

a cause of action if damage is caused thereby.

The plaintiff has brought himself within the statute, Sections 12(2) and 2(3), and shown his right to recover by proving solicitation by the defendants' agent of an offer to buy the stock; his false material statements in regard to it, with no proof on his part that with reasonable care he could not have learned the truth; innocence of the facts by the plaintiff; and payment of a consideration for the stock. As the plaintiff no longer owns the stock he is entitled under the statute to recover the amount paid for it with interest, less the amount received with interest.

Judgment will be rendered for the plaintiff on that basis with costs.