**UNITED STATES v. BATES et al.**

No. 8436.

Circuit Court of Appeals, Seventh Circuit.

Feb. 28, 1944.

Rehearing Denied April 20, 1944.

Wm. W. Smith, Harold V. Snyder, and Wm. T. Chism, all of Chicago, for appellants.

Maurice J. Walsh, J. Albert Woll, U. S. Attys., both of Chicago, Ill., for appellees.

Before EVANS, MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Defendants and one Schimkus, who was acquitted, were indicted for conspiracy with other persons unknown to the Grand Jury, to commit certain offenses, namely, to acquire, earmark for export and export gold bullion in bar or in converted similitudes of coins of the United States in violation of Executive Order 6260, 12 U.S.C.A. § 95 note, promulgated under authority of the Act of October 6, 1917, the Trading with the Enemy Act, as amended, 50 U.S.C.A. Appendix, § 1 et seq., while having no license so to do; to counterfeit coins in violation of Section 277 of Title 18 U.S.C.A., and to have possession of dies and parts designed for counterfeiting coins in violation of Section 283, Title 18 U.S.C.A. Defendants, having been found guilty, urge that the District Court wrongfully overruled their demurrer to the indictment; that the evidence is not sufficient to sustain the verdict; and that they were entrapped.

■ We think the demurrer was properly overruled. The mere fact that the alleged conspiracy had for its object the violation of more than one law, did not invalidate it. It is always proper to aver, as this indictment does, simply and clearly, a single conspiracy to violate one or more statutes. Proof of conspiracy to violate any one of them will support conviction. Taylor v. United States, 7 Cir., 2 F.2d 444; Hogan et al. v. United States, 5 Cir., 48 F.2d 516. This can work no subjection to double jeopardy, for a finding of guilty as to conspiracy only involves no substantive offense, and the judgment, obviously, will bar any subsequent prosecution for any conspiracy to violate any one of the statutes mentioned in the indictment growing out of the same facts.

■ Nor do we think that defendants were inadequately advised of the nature and character of the exact crime charged. The indictment is substantially in the terms of the Executive Order and the statutes, specifying all the necessary elements and including averments of specific overt acts; it is clearly sufficient. Jelke v. United States, 7 Cir., 255 F. 264; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278; Beland v. United States, 5 Cir., 100 F.2d 289.

■ Defendants complain that the indictment lacks sufficient averment that they had no license to acquire, earmark for export or export gold. But at the conclusion of each of the paragraphs defining the offenses which it is said defendants conspired to commit, it is charged that at the time they did not have or intend to have a license, issued by the Secretary of the Treasury, pursuant to the provisions of said Executive Order. This we deem sufficient averment of lack of license. Farber v. United States, 9 Cir., 114 F.2d 5, certiorari denied November 25, 1940, 311 U.S. 706, 61 S.Ct. 173, 85 L.Ed. 458.

■ We find, too, that the evidence fails to show entrapment. Employees of the Government do not defeat prosecutions merely by affording opportunity to commit the offense. If a defendant has appreciated the criminal nature of an undertaking and actually planned to carry it out, the mere fact that he found opportunity to do so through an agency which turned out to be an employee of the United States does not destroy his criminal intent or exempt him from guilt. Conway v. United States, 7 Cir., 1 F.2d 274, 276; Farber v. United States, 9 Cir., 114 F.2d 5.

The evidence upon which the Government relies follows: On October 20, 1942, Schaetzel, of the secret service, was introduced to defendant Bates by one Landau, an informer, in Chicago. Schaetzel told Bates that he lived in Dakota, was interested in mines and had gold to sell. Bates inquired as to whether Landau had advised Schaetzel of his (Bates) "connections" and remarked, "you have to be very careful of what I tell you because if we get caught, it will be very serious. We could be tried the same as the saboteurs in Washington." He asserted that he had a "contact" through one Carl Cobelt and had sold $83,000 in gold to German agents in New York. The same people, he said, now desired to purchase 5,000 ounces of gold. Schaetzel said that he would have to know what they would pay before he would set a price. Bates replied that he would see his people, remarking that Cobelt was a very much wanted man, but that he, Bates, would try to see him and make the necessary arrangements. Schaetzel in-

quired as to the means of payment and Bates answered that, in the previous instance, he had been paid "in old sized currency" brought to this country from abroad and that the gold he delivered had been taken to a submarine, thirty-six miles off the coast of Massachusetts.

The two met again a few days later when Bates reported that he had received word from his "representatives in the east" that they would take between 12,000 and 15,000 ounces of gold at $22, plus a commission of $1 an ounce. Bates asked for samples. Two days later he stated that he had again called his people and that they had told him that he and Schaetzel should go to New York to complete arrangements and that he had advised them they should have funds consisting of five, ten, twenty and fifty dollar bills in present-day currency.

The two men thereupon repaired to New York, stopping at different hotels. On the way, Bates exhibited a bar of gold and silver bearing an inscription, and stated that it had been given him by Cobelt's representative for his (Bates) identification. Schaetzel and Bates reached their destination on November 2. F.B.I. agents shadowed Bates in New York for a while, but lost him. Bates reported by telephone that he was with his people, awaiting arrival of the money but that there was some delay and that he would call again. At seven o'clock he telephoned that he had talked to his associates in Chicago, who had directed him not to bother the New York people but to return to Chicago. Schaetzel protested that he had been taken on a "wild-goose chase." This Bates denied, saying he would make another attempt to reach his associates. About 8:30 he went to Schaetzel's room. Again Schaetzel demurred and Bates offered the excuse that he could not control the arrival of the submarine. He said that Schaetzel could see the dies for stamping $20 gold coins later; that he would make another attempt to see his people and that, if they did not come, he would return to Chicago.

The next morning Bates reported once more that he had contacted his associates but that the man with the money had not arrived; that his people were very suspicious and that he would not see Schaetzel again until the money had arrived. Later in the day, however, Bates returned to Schaetzel's room. The latter again complained, and Bates replied, "Do you think I would waste my money coming to New York if I did not have a connection?"

While in New York, Schaetzel exhibited to Bates a sample of gold, procured from United States authorities. Drillings were made and delivered to Bates. On the way back to Chicago, Bates told Schaetzel that when they arrived he would meet Cobelt's lieutenant and arrange to have the agent talk to Schaetzel, who replied that he would have nothing further to do with Bates. Thereupon, the latter said "for heaven's sake, don't drop out."

After reaching Chicago, November 4, Bates reported that Cobelt's representative could not meet them for the reason that he was ill but that he would talk to Schaetzel by telephone the next day. The following morning at eleven o'clock, Schaetzel placed himself at a designated telephone station as directed by Bates and, when the instrument rang, Bates said "the man you are going to talk to is Otto." Thereupon a second voice came over the telephone, saying "my name is Otto. I don't know you. We have to be very careful, if anybody should catch us it would mean death." Schaetzel inquired as to whether the speaker was a German agent. "Otto" replied that he was. Schaetzel asked if he would handle the transaction in Chicago and when the money would arrive. Otto replied, "when the money does come, I will let Bates know and he will advise you."

After this conversation, on November 16, Bates informed Schaetzel that, while at the airport to meet the president of a company in St. Louis which he represented, he had also met Otto, and that Otto was going to make necessary final arrangements for purchase of the gold. At that time Bates exhibited a letter bearing a date sometime in 1936 and a signature purporting to be that of Goering.

On December 4 Bates reported that everything was ready; that his people were prepared to purchase some 8,000 ounces of gold in an amount of twenty-five to thirty thousand dollars every other day until the whole was delivered. On December 22 Bates informed Schaetzel that he had had an assay completed and had arranged for one of the Nazi representatives to come to Schaetzel's room to complete the arrangements. He returned later with a man whom he introduced as Schimkus, who claimed to be a German agent and to have

tested the gold. At that time somebody proposed a toast to Hitler. The evidence is contradictory as to whether this was in jest or meant seriously.

On January 4, 1943, Schaetzel met Bates for the last time. Bates promised that the deal would be completed in the near future. Schaetzel said that he had heard so many stories that he was tired of waiting and was about to leave the city. Bates replied, "don't do that, Schimkus has" control of the dies and is ready to turn them over for manufacture of $20 gold coins.

Bates' story of his acts and representations did not greatly vary from the government's version. He admitted making substantially all the statements attributed to him. He said that he told Schaetzel, at their original meeting, that he had contact with people who would buy gold through the North German Lloyd Steamship Agency, which had money and would handle the deal; that he wanted to talk to his people and eventually would make a deal for thousands of ounces; that his parties would want to examine the bars; that Schaetzel might want to examine the money, and that the whole thing would run into millions of dollars. He admitted the statements accredited to him concerning his former dealing with Nazi agencies, delivery of gold to a submarine, payment therefor and the various representations charged to him by Schaetzel. He denied, however, that any of his stories were true, and swore that he had had no connection with German representatives; that he was attracted by Schaetzel's assertion of control of a great amount of gold for sale and conceived the idea that he could realize great profit in effectuating a sale. He implied that he was trusting to luck to find a purchaser.

The controverted question of whether Bates told the truth on the witness stand or whether he told it when he made his admitted representations to Schaetzel was for the jury. If that body believed Bates' statements that he had dealt with German agents in selling gold; that he did represent German agents; that he could sell millions of dollars in gold through them; that he had satisfactory connections and could deliver the money for the gold and that he actually tried to perform, it was justified in finding him guilty of conspiracy to violate the law. But the function of determination of his guilt or innocence upon the controverted evidence was

one solely for the jury. Defendant cannot complain if the jury accepted at their face value his own statements of his own misdeeds. The triers of the facts were not bound to accept as true his protestations at the time of the trial that he had falsified at all times prior to the trial and had told the truth only when confronted with a charge that he had said what he admitted saying and had done what he admittedly claimed to be doing. They were not bound to find that he told the truth at the trial and falsehoods at all other times. Nor is it fatal that the object of the conspiracy has not been accomplished, or that it proved impossible of consummation. Williamson v. United States, 207 U.S. 425, 447, 28 S.Ct. 163, 52 L.Ed. 278.

The case against Smith rests upon a much more precarious foundation. This defendant was a business man of good reputation, president of his own manufacturing company, a recognized dealer in coins to whom Bates had sold old coins shortly before. Apparently when Bates thought he had found an opportunity to act as agent in disposing of gold bullion and it became necessary to find a purchaser, he turned to Smith. Smith advised Bates that he did not deal in bullion but that there were licensed dealers in various parts of the United States, giving him the name of Reed in Philadelphia. Bates interviewed Reed, who said that he had no license to engage in transactions such as this and that he could not handle the matter. Upon Bates' return to Chicago, he advised Smith of the result of his interview with Reed. Smith's interest had been aroused, as Bates had suggested that, if he could find a purchaser, Smith might have part of his commission. The latter thereupon suggested Berenstein, a New York dealer in gold, apparently of accredited standing, who had previously dealt extensively in the metal. At Bates' request, Smith communicated with Berenstein, who replied that he could handle gold, and thereupon, when Bates was in New York he called upon Berenstein who soon learned in conversation with Bates that the latter knew nothing about the gold business, the character of the gold he was offering, whether it was legitimately marked by government assayers, or anything else about it. Apparently Berenstein sensed that it was very questionable whether Bates had access to or could acquire bullion legally, for he ad-

vised Bates that he, Berenstein, could not handle Bates' matter and that the latter had better return to Chicago and take care of his electrical business rather than waste his time in this transaction.

On the return trip from New York to Chicago, Schaetzel had complained so bitterly that Bates apparently became fearful. He testified that he had been unable to negotiate with any Nazi agency and, apparently, could not sell the gold to any one. He interpreted Schaetzel's acts and remarks as unfriendly, even threatening. Schaetzel told him that the gold had been transported to New York at a cost of $3,000 and that Bates would have to reimburse him for the expense. Bates testified that he was worried when he reached Chicago; that he again turned to Smith in an effort to extricate himself from any necessity of paying the New York expense. Up to this time, Smith, so far as this record discloses, had no knowledge that Bates had ever represented that he had connections with Nazi agencies or that he could sell gold to German representatives. But Bates now reported to Smith what Schaetzel had said and informed Smith that he wanted to "ease the matter up and get rid of the thing" and that he wanted to convince Schaetzel that he had been in good faith in his representations. He asked Smith to telephone to Schaetzel and say that he was a German representative and that the matter would eventually be carried through. Smith at first refused, but, at Bates' earnest solicitation, he did eventually telephone to Schaetzel, using the name Otto.

We have observed Schaetzel's interpretation of that conversation. Smith's version is that Schaetzel said "you put us to a lot of trouble and expense and it cost us a lot of money to transport this gold back and forth" and that Smith then replied "don't blame me for it, it was not my fault. Be patient, I think this deal will go through at some later date." This, says Smith, was the end of the conversation. He insists nothing was said about a submarine or a foreign government. There-

after Smith did not appear in the transaction and advised Bates that he wanted nothing to do with it in any way whatsoever. The only other relevant evidence was that Smith and Bates were seen in conversation at the airport. Each of them testified that nothing said then related in any way to gold.

Had it not been for the conversation between Smith and Schaetzel, the Government would have had no evidence whatever upon which to base Smith's conviction. So our question is whether that conversation is of sufficient weight to sustain a conviction of a conspiracy to procure American gold for Nazi agents. In our opinion it is not greatly important whether we adopt Schaetzel's version or that of Smith. The incident was, to say the least, a foolish act upon the part of Smith; but he earnestly insists that he hoped merely to ease Schaetzel's demands on Bates and to help relieve Bates of an embarrassing situation. This is corroborated by Bates. There is no evidence whatever that Smith at any time made any actual move to do anything whatsoever other than to find for Bates a legitimate licensed purchaser of gold. The evidence is not only as consistent with innocence as with guilt but, in our opinion, is consistent only with his innocence. We think there is no evidence to sustain a verdict of guilt as to Smith.

The question suggests itself as to whether the judgment may be reversed as to one conspirator and affirmed as to the other. We know of no reason why such action should be deemed inconsistent with the present record. Inasmuch as the indictment charged each defendant with conspiring with the others and with other persons unknown to the Grand Jury, the jury might have rightfully convicted only one defendant. There was no inconsistency in the jury's acquittal of Schimkus and there is none in reversing as to Smith and affirming as to Bates.

The judgment against Smith is reversed; that against Bates is affirmed.