**C. L. HOLLOWAY and wife Martha J. Holloway**

v.

**Eugene HOWERDD et al.**

**Civ. A. No. 6396.**

United States District Court,
M. D. Tennessee,
Nashville Division.
March 28, 1973.

C. Allen High, Nashville, Tenn., Wilkes T. Thrasher, Jr., Chattanooga, Tenn., for plaintiffs.

Stanley T. Snodgrass, Nashville, Tenn., George M. Derryberry, Chattanooga, Tenn., for defendants.

## MEMORANDUM

MORTON, District Judge.

This case was instituted as a class action against seven defendants alleging violations of §§ 5, 12 and 17 of the Securities Act of 1933 (hereinafter "the Securities Act"), § 10(b) of the Securities Exchange Act of 1934 (hereinafter "the Exchange Act"), and Rule 10b–5 of the Securities and Exchange Commission. A nonsuit was taken as to one defendant, no proof was offered as to the lia-

bility of three others, and therefore Eugene Howerdd, Marion S. Lagerquist, and Tennessee Securities Company are the remaining three defendants. Jurisdiction is invoked pursuant to 15 U.S.C. §§ 77v and 78aa.

The plaintiffs' theory is that the defendants, acting individually and in concert, sold securities in a corporation known as Modular Properties, Inc. (hereinafter "Modular"), a Georgia corporation, in violation of the above enumerated statutory and regulatory provisions.

### FACTS

Prior to February 23, 1970, William B. Baumstark, Shell E. Heartley, Frank R. Holzers, Jesse J. Richardson, and Claude D. Crosby agreed to enter into a business of manufacturing and promoting the sale of modular buildings. Their concept was to form a corporation with its principal office in Atlanta, Georgia, and to capitalize it through the sale of stock within Georgia. On February 23, 1970, for and on behalf of the promoters, an agreement was entered into with Planned Financial Corporation (hereinafter "PFC"), represented by defendant Lagerquist, which provided for the sale by that organization of preincorporation and post-incorporation stock under § J of the Securities Act of Georgia to 25 individuals. PFC was to receive a 15 per cent commission of the total funds raised and 250,000 shares of the stock, known as "penny a share" stock, which was to be charged against the 15 per cent commission total.

On March 24, 1970, Modular was incorporated under the laws of the State of Georgia. The initial Board of Directors consisted of the five individuals heretofore named: Baumstark, Heartley, Holzers, Richardson and Crosby. On March 25, 1970, Crosby was elected president and Baumstark secretary-treasurer. Prior to the alleged illegal acts asserted by plaintiffs, however, Heartley and Richardson resigned from the Board. PFC managed to sell some stock of Modular prior to its incorporation, but afterwards was unable to sell post-incorporation stock.

Following its inception, Modular purchased a small plant in Monroe, Georgia, which became engaged primarily in the development of modular units, although some sales were undertaken from this plant.

In May, 1970, Lagerquist, representing PFC, learned that Howerdd was interested in selling Yetter Homes, a corporation of which he was the sole stockholder. Lagerquist arranged a meeting of Crosby and Howerdd to negotiate the sale of Yetter Homes to Modular. On July 16, 1970, an agreement of intent was executed between Yetter Homes, PFC and Modular whereby PFC would attempt to market and sell stock of Yetter Homes and Modular in sufficient quantities to enable Yetter Homes to repay a loan from Howerdd plus the value of the inventory, cash on hand, and accounts receivable. Modular would then own Yetter Homes outright. The plan called for Howerdd to become a director of Modular, and in accordance with the agreement he purchased 250,000 shares of Modular stock for $2,500. By letter of July 20, 1970, Howerdd explained this transaction to his accountant, and attached a list of individuals who might be interested in buying the stock provided for in the agreement of intent. A copy of this list was sent to PFC which unsuccessfully endeavored to make stock sales to those individuals residing in Georgia.

In August, 1970, without Howerdd's knowledge, Modular's Board of Directors, consisting of Baumstark, Crosby and Holzers, authorized negotiations with Attorney Raymond A. Prater and others in Chattanooga, Tennessee, to exchange Modular stock for that of Beaver Hamburger Systems.

By letters of August 31, 1970, and September 9, 1970, Crosby, president of Modular, enumerated to Howerdd changes he considered desirable in the operating procedures for Yetter Homes and recommended changes in its plant in Savannah, Georgia. In response to a

telephone communication on September 11, 1970, Howerdd went to the Monroe plant where he and Crosby rescinded the letter of intent by which Yetter Homes and Modular were to be merged. By letter of September 14, 1970, Howerdd confirmed the cancellation agreement to Crosby and also notified PFC. Howerdd further related that he could not accept Crosby's offer to be a director of Modular. PFC thereafter took no additional steps to attempt to sell any stock for Modular or Yetter Homes, and had no further connection with Modular prior to its complete financial collapse.

On September 17, 1970, Modular, without the knowledge of Howerdd, Lagerquist, PFC or any of its employees, agreed with Prater to acquire through stock exchange Beaver Hamburger Systems.

In October, 1970, H. Royce Mitchell, an employee of Modular, prepared a brochure showing that Howerdd was a director of Modular Management, Inc., a proposed firm which never came into existence. On November 4, 1970, Howerdd and Crosby attended a meeting in Jackson, Mississippi, of contractors interested in mass production of residences. On this occasion Howerdd saw for the first time the brochure prepared in October, 1970, and advised Crosby that he was not a director of Modular Management. It was later revealed that a number of these brochures were distributed in Tennessee and North Carolina without Howerdd's knowledge. Further reference will be made to these brochures hereinafter.

On November 23, 1970, Crosby, representing Modular, notified PFC in writing that any and all agreements between them were cancelled and that arrangements to acquire funding for Modular were being made elsewhere. On the same day Crosby fired his previously employed attorneys in Atlanta, Georgia.

Also in November, 1970, Prater, having become actively involved in the affairs of Modular, contacted Wilburn Tucker, a registered representative of Tennessee Securities, Inc., a stock brokerage concern in Nashville, Tennessee, about buying stock in Modular. Prater represented to Tucker that Howerdd was a director of Modular and also a substantial stockholder in Georgia Pacific Company. He stated that the stock being sold was unregistered, and that stock certificates issued to him could be held or assigned to Tucker, but that they would not be negotiated through the normal stock endorsement method. In this "piggy-back" arrangement, stock would be issued to Prater and held for the benefit of Tucker. Thereafter, Tucker purchased and sold stock to various investors in Tennessee under this piggy-back arrangement. All of this stock had been issued in the name of Prater and was never delivered to the ultimate purchasers.

Some time after November, 1970, Modular acquired a plant for the production of its product in Martinsville, Virginia.

In April, 1971, Baumstark, the secretary-treasurer of Modular, contacted Howerdd at his home in North Carolina. Howerdd had previously requested that he be refunded the $2,500 which he had paid for a subscription of stock in Modular. This stock, which Howerdd had subscribed for at the time of executing the letter of intent to merge Yetter Homes with Modular, had never been issued to him. Baumstark told Howerdd on this date in April, 1971, that the stock had somehow been allocated to Howerdd on the books of Modular and that certain stock powers were required to "get it off the books." Baumstark told Howerdd that the stock would be allocated or disposed of "to the boys." Howerdd executed some fifty stock powers in blank, and although his testimony in this instance is rather indefinite, he asserted that his understanding was that the stock would be divided among the other directors of the company. Thereafter, on May 17, 1971, twelve Modular stock certificates indicating ownership in Howerdd were transferred to individuals in North Carolina by the use of the stock powers which Howerdd had signed

in blank for Baumstark. The stock certificates were signed by Baumstark as an officer of Modular.

On May 28, 1971, Crosby and Prater were killed in a plane crash. In response to a telephone call, Howerdd agreed to go to Martinsville, Virginia, to see if any of Modular's inventory could be used by Yetter Homes. He was advised that Modular was in desperate financial straits, and needed to quickly dispose of some assets in order to raise cash for a payroll and delinquent taxes due the Internal Revenue Service. On June 1, 1971, Howerdd went to Martinsville, and agreed to act temporarily as a director of Modular to see what could be salvaged. In a meeting of Baumstark, Troy Beaver and Howerdd, Beaver was elected to the Board as secretary. Minutes of the meeting, dated June 4, 1971, were signed by Howerdd, Beaver and Baumstark as directors. In addition, they signed a form resolution to Virginia National Bank relative to Modular's bank account and loans.

On June 7, 1971, after Howerdd had returned to North Carolina, he discovered a $203 check which had been left at his home by Baumstark. This check was in payment of stock sold by Baumstark in North Carolina utilizing a stock power signed by Howerdd. Howerdd sent the check to Modular denying any interest therein or any prior knowledge of the sale.

In June, 1971, it became obvious that Modular was in dire financial difficulty and stockholder meetings were held in Chattanooga and Cookeville, Tennessee. On June 14, 1971, Baumstark committed suicide, and on June 21, 1971, Howerdd resigned as a director of Modular.

On June 23, 1971, a meeting of stockholders was held in Martinsville, Virginia, which was attended by Lagerquist, representing PFC's 250,000 shares of stock, and other individuals to whom PFC had sold preincorporation stock. Lagerquist agreed to serve as a temporary director, and he immediately returned to Atlanta to investigate the financial resources of several individuals who were evincing interest in the corporation. Upon learning that these persons were of questionable financial substance, he immediately resigned as a temporary director.

It is of importance to note that all the stock sold in Tennessee was issued in the name of Raymond Prater, and that no stock transfers were made to the ultimate purchasers. Prater assigned some stock certificates to William Tucker which were not broken down on the company books nor delivered to the ultimate purchasers. All of the stock sold in North Carolina was issued in the name of one individual, Garland Rakestraw. Just as in the piggy-back transactions in Tennessee, the stock certificates were not broken down and delivered to the individual purchasers, nor did the individual purchaser's name appear on the company books as owner of the stock. It is of further interest to note that no application for stock registration was ever filed with the Securities and Exchange Commission in Washington, D. C.

Modular subsequently went into bankruptcy, and this suit was instituted to obtain for the stockholders in Georgia, Tennessee, North Carolina, and other areas the purchase price of their stock.

As previously noted, this suit is not against the promoters of Modular, or Prater, but against Lagerquist, Howerdd, and Tennessee Securities as alleged principals, aiders and abettors, and controlling persons as defined in the Securities Act and the Exchange Act. The proof relative to each of these defendants will be examined separately.

### Marion S. Lagerquist

Since there has been no evidence that Lagerquist acted as a "seller" within the meaning of either the Securities Act or the Exchange Act, plaintiffs charge that he should be found liable as a "controlling person" under §§ 15 and 20 of the respective acts, 15 U.S.C. §§ 77o and 78t. The following factors are set forth by plaintiffs in support of this contention:

(1) For and on behalf of PFC, Lagerquist agreed to and did sell 1,406,294

shares of preincorporation stock in Modular to 25 persons.

(2) In the initial stages of Modular's promotion, Lagerquist accepted on behalf of PFC 250,000 shares of one-cent stock.

(3) Lagerquist was, at one time, listed as Modular's agent for service of process.

(4) On behalf of PFC, Lagerquist signed the letter of intent to finance the merger of Yetter Homes and Modular through the sale of stock of which PFC undertook to sell 2,000,000 shares.

(5) At one point, Lagerquist served as a director of Modular.

 Despite the existence of these factors, the proof fails to support a finding that Lagerquist's involvement with Modular was that of a controlling person. The following considerations negate such a finding. First, the sale of preincorporation stock was an activity which is excluded from the provisions of the Securities Act. Section 2(3) states in part:

". . . The terms defined in this paragraph and the term 'offer to buy' as used in subsection (c) of section 5 *shall not include preliminary negotiations or agreements between an issuer* (or any person directly or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer) *and any underwriter* or *among underwriters* who are or are to be in privity of contract with an issuer (or any person directly or indirectly controlling or controlled by an issuer, or under direct or indirect common control with an issuer)." (Emphasis added.)

Second, Lagerquist never personally owned any stock in Modular, and the $2,500 worth of "penny-stock" that PFC was to receive as a part of their service fee was never issued. Third, although Lagerquist signed the letter of intent of July 16, 1970, to finance the merger of Yetter Homes and Modular, neither he nor PFC ever sold any stock pursuant to

this agreement. Additionally, all financing agreements were cancelled prior to the purchase of stock by any plaintiff represented herein. Fourth, Lagerquist denies ever having knowledge of his listing as Modular's agent for service of process, and his testimony is supported by that of Modular's attorney. Finally, although Lagerquist did serve as a director of Modular, it was solely on an emergency basis following the deaths of Crosby, Prater, and Baumstark, and after the dates of stock purchases by plaintiffs herein. He resigned this directorship within a month's time, and without having ever exercised any manner of control over persons actively involved with Modular's operation. Moreover, the court finds that his involvement at this point arose primarily from a desire to ascertain the status of Modular in order to report to Georgia purchasers of preincorporation stock.

In addition, the proof showed that Lagerquist and PFC accounted to Modular for the proceeds of all stock they sold, and that except for his accounting for PFC's sale of preincorporation stock, Lagerquist had no involvement with Modular between September 14, 1970, the date of Howerdd's termination of the merger agreement, and June 23, 1971, the date he began his short-term directorship.

In conclusion, the court finds that plaintiffs have failed to establish the existence of any relationship between Lagerquist and a principal of Modular, any stock purchaser, or any company activity which warrants his liability in this action.

### Eugene Howerdd

Plaintiffs assert that Howerdd likewise is liable under the Securities Act as a controlling person, and under the Exchange Act as a controlling person and as an aider and abettor. The principal factors urged in support of liability are Howerdd's status as a director of Modular, the inclusion of his resume in the brochure prepared by Modular Manage-

ment, Inc., and his signing in blank stock powers which were utilized in the piggy-back scheme of stock sales.

Plaintiffs place much emphasis upon Howerdd's membership on Modular's Board of Directors and assert that this factor alone may be sufficient to render him a controlling person under the Exchange Act if he held the position during the time stock was offered or sold to the public. This excerpt from Moerman v. Zipco, Inc., 302 F.Supp. 439, 447 (E. D.N.Y.1969) is offered in support of this conclusion:

"The conclusion is inescapable that persons who act as directors are in control of the corporation. This is especially true in light of the liberal construction of this section as including 'indirect means of discipline or influence short of actual direction.' Myzel v. Fields, 386 F.2d 718, 738 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)."

The court accepts as settled law the proposition that directors of a corporation may be found liable as controlling persons, both under the Securities Act and the Exchange Act, even without actively participating in the conduct upon which liability is founded. *See* Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa.1966); Hawkins v. Merrill Lynch, Pierce, Fenner & Beane, 85 F.Supp. 104 (W.D.Ark. 1949).

Nevertheless, a director's liability, pretermitting the good faith defense of § 78t, presupposes some extent of actual participation in the corporation's operation before the consequences of control may be imposed. Moerman v. Zipco, Inc., *supra*, at 447, stated that directors cannot be held to the same degree of supervision over corporate officials as is required of brokers over their salesmen, and implicit in the decision was that even director liability must be predicated upon active participation in

board meetings and other management functions. Regardless of what may in general suffice as active participation, the court feels that at a minimum, persons sought to be charged with control must occupy a director's position at times material to the litigation, and act in a manner which directly or indirectly influences the purchase of securities.

In the instant case, apart from the question of Howerdd's extent of control over Modular's principals and employees, there is dispute as to how long he actually served as a director. While Howerdd denies actual service as a director of Modular except for the period when he agreed to serve temporarily on an emergency basis from June 4 to June 21, 1971, plaintiffs assert that his directorship existed at at least two other times —following the July 16, 1970 agreement of intent, and during 1971 as evidenced by his alleged attendance at a July 31, 1971 board meeting.

The July 16, 1970 agreement of intent provided in part that Howerdd *would be elected* to the Board of Directors prior to the completion of PFC's fund-raising efforts. This agreement was cancelled in September, 1970, and on September 14, 1970, was conveyed in letters from Howerdd to Crosby, Modular, and PFC. The cancellation called for the refund of Howerdd's $2,500 stock purchase, and there is no evidence that he was actually elected to the Board of Directors prior to September 14, 1970.

Following the signing of the agreement of intent, Howerdd wrote his accountant informing him of the arrangement, and on July 23, 1970, copies of the letter were mailed to 23 potential stock purchasers in four states, and to eight other persons for information and publicity. This letter, which set forth the fact that the merger of Yetter Homes and Modular was being undertaken, and that stock would be sold to the public, is offered by plaintiffs as evidence of Howerdd's efforts to aid and abet the promotion of stock sales.

The court finds this letter insufficient to establish Howerdd as either a

seller or a controlling person in the sale of Modular stock. Assuming arguendo that this letter would qualify as an "offer to sell" under § 2(3) of the Securities Act, not only did no person receiving the letter purchase stock, but also it has not been shown that any plaintiff herein ever even saw the letter.

In reference to Howerdd's directorship, Mr. Joseph Costanzo, Modular's corporate attorney from inception until November 23, 1970, and who attended all board meetings during this period, testified that at no time during his retention did Howerdd ever attend a board meeting, nor did he hear his name ever mentioned. It was further established that no stock was sold to Tennessee or North Carolina purchasers during the period up to November 23, 1970.

On November 23, 1970, Costanzo was discharged, and in December, 1970, Modular retained another attorney. It was in December, 1970, that Modular's corporate records first revealed a director's meeting on July 31, 1970, which was supposedly attended by Howerdd and others, but the minutes of which were signed only by Baumstark. The credibility of these minutes is subject to serious question since they were prepared five months after the meeting allegedly took place, were signed by only one director, and record a meeting which the corporate attorney of that date testified never occurred.

The court finds that the only period during which Howerdd agreed to and did serve as a director of Modular was from June 4 to June 21, 1971, when he acted as a temporary director following the deaths of the principal officers of Modular. Further, there has been no proof introduced by plaintiffs that, during this period or any other, Howerdd exercised any degree of control over the company's officers or promoters, or over any company activity. During this period of directorship Howerdd did attempt to dispose of Modular's inventory, and signed a form resolution of the Virginia National Bank, but these activities were undertaken in an effort to lend assistance to a company whose principal officers were dead and which was facing financial collapse. Any manner of control exercised at this time was after the sale of stock at issue, and was not over any person potentially liable under the Securities or Exchange Acts.

Plaintiffs further seek to establish Howerdd's status in a controlling role by virtue of his inclusion in "Key Mod," a brochure circulated by Modular Management. Modular Management was apparently the concept of principals of Modular, and although it never came into existence, was intended to operate as a licensing company to promote the modular construction concept. The "Key Mod" brochure described the company's intended operation, and listed Howerdd, among others, as a director. Royce Mitchell, an employee of Modular, stated that he prepared the brochure and had personally contacted Howerdd about his personal data to be listed. Howerdd denied any such conversation or that he ever consented to being a director of Modular Management, or to his inclusion in the brochure. He testified that the first time he saw the brochure was on November 14, 1970, when Crosby showed it to him during a meeting of contractors in Jackson, Mississippi. He testified further that he told Crosby that he was not a director of Modular Management, and wanted his name removed from the brochure. Crosby allegedly replied, in effect, that "You can't blame me for trying." Although Mitchell testified that the brochure was not designed for use in the sale of stock, it apparently was shown to several prospective investors in Modular.

The record as a whole casts substantial doubt on Mitchell's credibility. The brochure's descriptive data of Howerdd is inaccurate and is no more than might be accumulated from hearsay and other unverified information, and is reflective of a scheme to utilize Howerdd's name in the promotion of a corporation's management services. Plaintiffs have failed to establish that Howerdd ever consented to his inclusion in this brochure, or

that he ever knew that it was being utilized in the sale of Modular stock.

The only action taken by Howerdd which renders his avowed non-involvement questionable was his signing of some 50 stock powers in blank, knowing that they were to be used in the disposition of stock in Modular. However, even this, when viewed in the context of all the circumstances, fails to warrant the conclusion that Howerdd was a controlling person. As previously stated, Howerdd signed the stock powers upon the advice of Baumstark in April, 1971, that such would be necessary in order to "get off the books" the $2,500 worth of stock subscribed to by Howerdd, but which had never been issued. Howerdd had requested the refund of his $2,500 following the cancellation of the agreement of intent on September 14, 1970, and he testified that he understood this stock would be divided among the directors of Modular rather than being sold to outside investors.

However, in May, 1971, twelve certificates of stock in Modular, which portrayed Howerdd as owner, were transferred to purchasers in North Carolina by use of the stock powers signed in blank by Howerdd for Baumstark. The stock certificates, which had never been issued to Howerdd, were signed by Baumstark as an officer of Modular. All stock transferred via these stock powers went to North Carolina purchasers, all but six of whom have elected to opt out of this proceeding. Moreover, there is no evidence that any of these six, by reason of Howerdd's notation on the stock certificates or the "Key Mod" brochure, made their purchase in reliance upon Howerdd's association with Modular.

The sale of this stock in North Carolina resulted in one check being delivered to Howerdd. The check, for $203.50, issued by Garland Rakestraw, was left at Howerdd's home during his absence on May 23, 1971, by Baumstark. Baumstark had transferred 20,350 shares of "penny-stock" to Rakestraw by attaching to the stock certificates a blank stock power signed by Howerdd. Although eleven other similar transfers involving several thousands of dollars had been made, this was the only check placed in Howerdd's possession. In this instance, he returned the uncashed check to Modular and disclaimed any interest in the proceeds.

■ Estoppel is the only theory by which Howerdd might be held legally accountable, but plaintiffs have failed to establish a sufficient basis to justify that manner of relief. At most, it may be said that Howerdd unknowingly placed tools in the hand of a fraudulent seller who, without Howerdd's influence or control, used them to effectuate the sale of stock to innocent purchasers.

■ On the basis of the above findings of fact, the court finds that Howerdd did not act as a seller, controlling person, or an aider and abettor within the meaning of the Securities Act and the Exchange Act. His involvement with Modular is found to have been in good faith, and without the intent to mislead or defraud purchasers of stock from principals of Modular, over whom he exercised no control or supervision. The record clearly reveals that the principals of Modular who exercised control and influence in the sale of Modular stock were Crosby, Prater and Baumstark.

*Tennessee Securities, Inc.*

Tennessee Securities, Inc. became involved in this litigation through one of their registered representatives, Wilburn Tucker, who has been a salesman with the company for many years. In the latter part of 1970, Raymond Prater, a friend of Tucker's, contacted him and stated that he was privy to a good investment in Modular, which had a glowing future. He further stated that he had available a block of stock to be sold for $25,000, but which was unregistered and could not yet be transferred to proposed purchasers. However, he added that an application for registration with the Securities and Exchange Commission would be made shortly, at which

time the stock could be transferred. Tucker, relying upon Prater's representation, borrowed a sum of money from a bank in Cookeville, Tennessee, in order to purchase stock. When informed of the reason for the loan, the banker, who had previously dealt with Tucker, also wanted some of the stock. Tucker advised him that he was acquiring the stock from a friend, and that since he would not be selling it in his capacity with Tennessee Securities, no commission would be charged. The banker purchased stock, and related the arrangement to other individuals in Cookeville, several of whom also made purchases either directly from Tucker or by sending their money to the banker who deposited it to Tucker's account.

In addition to these transactions, Tucker told principals of Tennessee Securities that he had acquired for private placement a $25,000 block of stock in Modular. He related that he had acquired $5,000 of the stock for himself, and was negotiating through his banker for the additional $20,000. The principals agreed to purchase this entire remaining amount. They testified that they were at no time aware that Tucker was making this stock available to other individuals, but assumed that he was not on the basis of their purchase of what they believed to be the balance of Modular stock available to Tucker. Thereafter, however, Tucker did sell many shares of stock in Tennessee under the previously described "piggy-back" arrangement. Tucker further testified that the information he gave to several purchasers regarding Georgia Pacific's financial backing of Modular and Howerdd's capacity as principal and director had been related to him by Prater.

A number of purchasers who knew that Tucker was a salesman for Tennessee Securities never spoke to him about buying Modular stock, but upon learning of his involvement sent checks to him or his banker. Except for a single instance when a check was mailed to Modular, these funds were all deposited in Tucker's personal bank account and then for-

warded to Prater. Tucker testified that he was "almost sure" that he advised all the persons with whom he dealt personally that he was not representing Tennessee Securities in his sales of Modular stock nor making a commission, but was handling this purely as an accommodation for persons desiring to make the investment. Further, the evidence revealed that a number of individuals who purchased stock did so on the recommendation of others who had purchased from Tucker, but without knowledge that he was either a registered representative or an employee of Tennessee Securities.

It appears relatively certain that some of Tucker's aforementioned activity would constitute violations of both the Securities Act and the Exchange Act. However, he is not a defendant in this action, and his participation is relevant only to the liability of Tennessee Securities.

■ Plaintiff asserts that Tennessee Securities is liable under § 12(2) of the Securities Act, 15 U.S.C. § 77l(2), since this suit is against a brokerage house to recover for employee misconduct. Plaintiffs' theory of liability is based upon the alleged apparent authority of Tucker in making sales of worthless, nonregistered securities, and Tennessee Securities' failure to meet the § 12(2) burden of proof that "[it] did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . . ."

Tennessee Securities, however, contests that its liability can arise only under the controlling person provision of § 15 of the Securities Act, 15 U.S.C. § 77o. Under this section, a defendant need only show that it had "no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

A controversy exists as to which above section controls the liability of brokerage houses under the Securities Act for employee fraud and misrepre-

sentation. The choice is an important one because a defendant-broker's burden of proof under § 12(2) is more difficult to meet than that required under § 15. Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689 (9th Cir. 1967), which held that broker liability arises only under § 15, and Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1968), rev'd. on other grounds, 422 F.2d 1124 (4th Cir. 1970), which held brokers amenable to suit under § 12(2), are illustrative of the conflict.

■ Congress intended that the Securities Act of 1933 provide better protection for investors than was available at common law. (H.R.Rep.No.85, 73rd Cong., 1st Sess. 1933). Application of § 15 frustrates that intent because under that section a broker can defend by proving that it had no knowledge of the fraudulent transaction, whereas the common law provides no such defense for an employer.

Therefore, the court feels that the *Johns Hopkins* holding, basing liability on § 12(2), constitutes the proper approach to the liability of Tennessee Securities. Under this approach, the presence of either actual or apparent authority in an employee involved in transactions in which fraud or misrepresentation occur is sufficient to bring the broker within the meaning of § 12(2). *See also* Murphy v. Cady, 30 F.Supp. 466 (S.D.Me.1939), aff'd. 113 F.2d 988 (1st Cir. 1940), cert. denied 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940); Schillner v. H. Vaughan Clarke & Co., 134 F. 2d 875 (2d Cir. 1943).

In the instant case, there are three classes of individuals who purchased securities through Tucker: (1) those who knew that Tucker was selling Modular stock on his own behalf and not as agent for Tennessee Securities; (2) those who knew that he was a registered security dealer for Tennessee Securities but were not informed that he was operating separate and apart from the firm in this instance; and (3) those who did not know that he was a registered security dealer or representative.

■ The well established rule in Tennessee, as elsewhere, is that a principal is bound by the acts of an agent done within his apparent or ostensible authority. McCoy v. Willis, 177 Tenn. 36, 145 S.W.2d 1020 (1940). In commenting on this rule, the Tennessee Supreme Court in quoting with approval from Corpus Juris, has stated:

" 'Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Ostensible authority is such authority as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess, and in some jurisdictions it is so defined by statute. Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential to the application of the above general rule that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority.' [2 Corpus Juris, 574, 575]" Southern Railway Co. v. Pickle, 138 Tenn. 238, 245, 197 S.W. 675, 677 (1917).

In quoting from Mechem on Agency, 2d ed., § 1990, the Tennessee Supreme Court has further said that:

". . . 'The American cases have generally held the principal liable to innocent third persons where the

representation was made in the course of the principal's business and apparently for his account and while the agent was acting within the general scope of his authority, even though in the particular case he was secretly abusing his authority and attempting to perpetrate a fraud upon his principal or some other person for his own ultimate benefit.' " Conaway v. New York Life Ins. Co., 171 Tenn. 290, 304, 305, 102 S.W.2d 66, 72 (1937). *See also* Restatement (Second) of Agency, §§ 165, 257, 258 (1958).

 Accordingly, the court holds that those individuals who purchased the stock in issue from Tucker knowing of his status with Tennessee Securities but without knowledge that his sales in this instance were accomplished apart from that capacity may, upon the basis of appropriate allegations, recover their damages from Tennessee Securities.

The court holds, however, that no purchaser of either of the other two classes herein may recover from Tennessee Securities on the basis of either § 12(2) or § 15. The liability of Tennessee Securities under § 12(2) in this instance is predicated upon the doctrine of respondeat superior, and the apparent authority of Tucker to make the transactions at issue. The situation is the same as prevailed in Murphy v. Cady, *supra*, where the court found that the employee had "put himself and his employers behind the statements . . . and gave them currency on the responsibility of the firm . . . and that [the plaintiff] had a right to so understand." *Id.*, 30 F.Supp. at 468.

Therefore, those individuals who made purchases of stock from Tucker without any knowledge of his employment or with the clear understanding that he was selling Modular stock completely independent of his employment with Tennessee Securities cannot now bind the firm on the basis of Tucker's apparent or ostensible authority. Furthermore, assuming arguendo, that broker-dealers may, without reference to the scope of employee authority, be liable as controlling persons under § 15 of the Securities Act, upon judging the credibility of the testimony of its principals and in consideration of their experience, expertise, and knowledge of securities law, the court finds that Tennessee Securities has sustained the § 15 burden of proof that it had no knowledge of nor reasonable grounds to believe in the existence of Tucker's activity in publicly selling unregistered stock.

The attorney for the plaintiffs shall prepare an order incorporating the findings of this memorandum by reference, submit said order to opposing counsel for approval as to form, and file it with the court for signature.