**FIRST TRUST & SAVINGS BANK OF ZANESVILLE, OHIO**

v.

**FIDELITY–PHILADELPHIA TRUST CO.**

No. 11238.

United States Court of Appeals, Third Circuit.

Argued April 6, 1954.

Decided June 28, 1954.

Rehearing Denied July 20, 1954.

2. Formerly R.S. § 3224.

Israel Packel, Philadelphia, Pa. (Speiser, Satinsky, Gilliland & Packel, Philadelphia, Pa., Pugh, Knapp & Miller, Zanesville, Ohio, MacCoy, Evans & Lewis, Montgomery, McCraken, Walker & Rhoads, Saul, Ewing, Remick & Saul, Philadelphia, Pa., on the brief), for appellant.

Arthur Littleton, Philadelphia, Pa. (Thomas B. K. Ringe, John R. McConnell, J. Wesley Oler, Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

This case presents the often recurring situation of two people who, doing busi-

ness in the ordinary course, have been fooled by a swindler. The swindler disappears or goes to jail. Which of the two parties is to bear the loss his rascality has occasioned?

The trial court made very full findings of fact on the history of the dealings among the parties and also the facts of the immediate transactions out of which this suit arose. Those extensive findings need not be repeated here. See D.C.E.D. Pa.1953, 112 F.Supp. 761.

Our set of operative facts gets down to this comparatively simple case. A bank's customer (the bank being the defendant, Fidelity-Philadelphia Trust Company) brings to the bank what purports to be the negotiable promissory note of a whisky distiller. This note is accompanied by what purports to be a negotiable warehouse receipt evidencing a deposit of whisky, which is to be collateral security for the note. Both the note and the warehouse receipt are, in fact, spurious. The customer (Philadelphia Acceptance Corporation, hereafter called PAC) does two things. First, it deposits with the bank in its trust department the purported warehouse receipt, for which the bank issues a safekeeping receipt and puts the document in a file. This is a bailment for the benefit of PAC and the purchaser of the promissory note. The charge made by Fidelity for the service is barely sufficient to cover its expenses in connection

therewith. Second, the customer, PAC, leaves with the collection department of the bank a draft drawn by itself in its own favor on the plaintiff, The First Trust and Savings Bank of Zanesville, Ohio, (Zanesville), which is to be the purchaser of the note. Forthwith defendant Fidelity credits its customer with the amount of the draft and charges PAC interest until the transaction is closed. It is closed by Fidelity's forwarding the draft, note and safekeeping receipt to Zanesville. This bank in turn sends Fidelity a check payable to Fidelity's order and drawn on the Chase Bank in New York. In due course of time this check clears and Fidelity is thus reimbursed for the credit it has made to its customer.

The first problem is: Does this transaction make Fidelity a seller within the terms of the Securities Act of 1933?[1] It should be noted that what was done here is very similar to what goes on in thousands and thousands of cases where a bank advances funds to its customer upon having endorsed to it the customer's draft on a third party, accompanied by a negotiable bill of lading or warehouse receipt. The only addition here is the keeping of the purported warehouse receipt in the files of Fidelity, not because Fidelity wanted it, but because of the arrangement made between PAC and Zanesville.[2] The situation differs also from the sight-draft-bill-of-lading-at-

[1] "Any person who—

"(1) sells a security in violation of section 77e of this title, or

"(2) sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of section 77c of this title), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of

proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C.A. § 77l.

[2] Originally, PAC would forward the warehouse receipts directly to Zanesville. Because of the paper work required by this arrangement, a Zanesville teller asked PAC's agent to suggest a less cum-

tached transaction in that here PAC's draft was accompanied by the distilling company's note, which was the supposed thing of value given for the loan.

██ If this set of facts constitutes Fidelity a seller under the Securities Act, it seems to us inevitable that every bank which advances money to a customer upon a sight draft and negotiable bill of lading is also a seller. True there are one or two additional facts in this case. Fidelity here stored in its safekeeping files the purported warehouse receipt. But we do not see that this fact affects the relation of the parties to the collection transaction. The deposit of the receipt was a convenience to PAC and Zanesville, for it made easier the substitution of new receipts and notes when this was in order. It was frequently in order, for during the years 1939 to 1950, Zanesville had made 220 purchases of distillers' notes from PAC. The plan for such deposit with Fidelity was worked out by PAC and Zanesville, as shown in the recital in footnote 2.

It is also true that Fidelity sent some information to Zanesville at one time about its customer, PAC, at Zanesville's request. We do not see how that adds anything to the concept of Fidelity as a seller. The information was gratuitously given. Fidelity did not urge by intimation or express statement that Zanesville should act upon the information. Whether the letter had other legal consequence we shall discuss later.

The words of the federal Securities Act of 1933 are very, very comprehensive indeed. The subject matter includes documents such as drafts and notes. By express wording "sale" is pretty broadly defined. Here is the language: "The term 'sale', 'sell', 'offer to sell', or 'offer for sale' shall include every contract of sale or disposition of, attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value * * *." 15 U.S. C.A. § 77b(3).

██ Furthermore, it can hardly be denied that when a bank takes a document for collection advancing to its customer credit prior to the actual collection being made, the bank then becomes at least a security owner. Maryland Casualty Co. v. National Bank of Germantown & Trust Co., 1936, 320 Pa. 129, 182 A. 362. And see Note, 22 A.L.R.2d 479 (1952). And when it endorses the instrument, on which it thus advanced credit, to another bank by the general endorsement "pay any bank, banker or trust company," and gets its money, has it not passed its interest in that document along to him who pays the draft and gets the supposedly valuable bill of lading, warehouse receipt or note accompanying the draft? And if that is so, why have we not been pushed into the startling conclusion that every bank that makes an advance on an instrument left with it for collection, and passes that instrument on to someone else, has become a seller under the terms of the federal statute, if the transaction is one in interstate commerce?

██ We think that we do not need to reach this startling conclusion, at least on the facts of this case. In this we are supported by the clearly established law of Pennsylvania with regard to the relation of a bank and its depositor. It is true that in construing the federal statute we are not, of course, bound by state law concepts. But in deciding whether Fidelity has done things which bring it under the terms of a federal statute, we look to the law of Pennsylvania to see the state law consequence of business dealings between PAC, a Philadelphia customer, and Fidelity, a Philadelphia bank.

In the case of each of the worthless notes involved in this litigation, PAC, as stated above, had drawn a draft in its

---

bersome method of handling the receipts. He suggested that PAC deposit the receipts with defendant, which in turn would forward to plaintiff a safekeeping receipt, usually covering several warehouse receipts. Zanesville agreed to this procedure.

own favor upon Zanesville. These drafts were endorsed to the order of Fidelity, without qualification. Such endorsement is a special endorsement under section 34 of the N.I.L.[3] and is in no sense a restrictive endorsement. Ordinarily when a person is given physical possession of a negotiable instrument thus specially endorsed to him he becomes the owner. But in Pennsylvania this matter is expressly covered by a statute of 1931 and that statute is important enough to quote here:

"Except as otherwise provided by agreement and except as to subsequent holders of a negotiable instrument payable to bearer or indorsed specially or in blank, where an item is deposited or received for collection, the bank of deposit shall be agent of the depositor for its collection and each subsequent collecting bank shall be subagent of the depositor but shall be authorized to follow the instructions of its immediate forwarding bank, and any credit given by any such agent or subagent bank therefor shall be revocable until such time as the proceeds are received in actual money or an unconditional credit given on the books of another bank, which such agent has requested or accepted. Where any such bank allows any revocable credit for an item to be withdrawn, such agency relation shall, nevertheless, continue, except the bank shall have all the rights of an owner thereof against prior and subsequent parties to the extent of the

amount withdrawn. * * *" Purdon's Pa.Stat.Ann. tit. 7, § 213.

A later section of the same statute provides:

"Where a deposited item is payable to bearer or indorsed by the depositor in blank or by special indorsement, the fact that such item is so payable or indorsed shall not change the relation of agent of the bank of deposit to the depositor, but subsequent holders shall have the right to rely on the presumption that the bank of deposit is the owner of the item. * * *" Purdon's Pa.Stat.Ann. tit. 7, § 215.[4]

Now it is true that to become a "seller" under the Securities Act one does not have to be the owner of that which he "sells." A broker can, under some circumstances, become a "seller." Cady v. Murphy, 1 Cir., 113 F.2d 988, certiorari denied, 1940, 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458, (seller's broker); Boehm v. Granger, 1943, 181 Misc. 680, 42 N.Y.S.2d 246, affirmed without opinion, 1st Dept., 1944, 268 App.Div. 855, 50 N.Y.S.2d 845, (buyer's broker). On the other hand, Professor Loss says that there are various kinds of mechanical activities which do not come under the statute and his extensive experience in this field gives his view importance, especially in the absence of case law to the contrary.[5]

The agent for collection under the Pennsylvania law is not a purely "mechanical" forwarder. He is not a seller. Nor is he a broker. But we

---

3. Purdon's Pa.Stat.Ann. tit. 56, § 85; to be superseded by the Uniform Commercial Code, effective July 1, 1954, 12A P.S. § 1–101 et seq.

4. These two sections will be superseded by the Uniform Commercial Code, which becomes effective July 1, 1954 in Pennsylvania. The Code provision reads as follows:
"Unless a contrary intent clearly appears, a depositary bank takes an item for collection regardless of the form of indorsement or lack of indorsement and even though credit for the item is sub-

ject to immediate withdrawal as of right." Purdon's Pa.Stat.Ann. tit. 12A, § 4–201.
See also the comment to that section. The rule likewise represents the case law in Pennsylvania. See Lipschutz v. Philadelphia Savings Fund Soc., 1933, 107 Pa. Super. 481, 164 A. 74, and cases cited therein; Foster v. Federal Reserve Bank of Philadelphia, D.C.E.D.Pa.1939, 29 F. Supp. 716, affirmed 3 Cir., 1940, 113 F. 2d 326.

5. Loss, Securities Regulation 341 (1951).

think that the clear and insistent characterizing of the collecting bank under Pennsylvania law as agent supports our conclusion that Fidelity in receiving drafts from PAC and forwarding them for collection to Zanesville did not become a seller under the Federal Securities Act.

Assume now that what is said above is incorrect, and that we are driven to the conclusion that Fidelity was a "seller," under the Securities Act. What has it done which will place liability upon it? Or, to put the matter in a different way, in statutory language, has it met the burden the statute places on it to prove that, if there was an untruth or omission, it "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission * * *." [6] There are two points in this connection made by Zanesville.

One of the points has to do with a letter which the credit manager of Fidelity sent to Zanesville back in March, 1949.[7] That letter was in answer to an inquiry made of Fidelity by Zanesville concerning the credit of Philadelphia Acceptance Corporation, which was a customer of Fidelity for other things than the kind of transaction described above. Fidelity's answer started by announcing in big type that the information was gratuitous and given as a business courtesy.[8] We make nothing of that. A man may become just as much liable for the consequences of his lie if he does it for nothing as if he gets paid for it. Restatement, Torts, § 552, comment c.

Appellant makes much of the point that the financial affairs of Mr. Collom, the president and perhaps sole shareholder of PAC, were not mentioned in Fidelity's letter. We make nothing of this either. The inquiry was about the corporation. Furthermore, we do not know whether tax liens which are said to have existed against Mr. Collom at the time were or were not subsequently satisfied. Nor do we know about a judgment which was said to be outstanding against him at the time—whether it was reversed, satisfied or what. At any rate, the inquiry was about the corporation and it was the corporation which was Fidelity's customer.

■ There is more to be said about the letter however. It went on to say that PAC's account was handled in a satisfactory way and gave an explicit statement about an average five-figure balance. This five-figure statement was true but it was also found as a fact that twelve times in the two months before the letter was written, PAC had had overdrafts amounting to sums from several hundred dollars to over thirty-six thousand dollars. We do not go with the argument that when a man says something that is literally true he has told the truth even though he does not tell the other things which would qualify the statement made. "To tell half a truth only is to conceal the other half."[9] But the saving grace of the letter is the last sentence. The defendant's credit manager said: "A condensed balance sheet exhibited to us last year indicates that the net worth of the Philadelphia Acceptance Corporation is limited and is substantially less than outstanding obligations." That, we think, is enough. The sum total impression from the letter is truthful and certainly gives warning to

6. See note 1, supra.

7. The transactions out of which the spurious notes and warehouse receipts arose were consummated in July, 1950.

8. "This information is furnished as a matter of business courtesy on the understanding it is confidential and no responsibility therefor attaches to this bank or any of its representatives."

9. Mitchell, J., in Newell v. Randall, 1884, 32 Minn. 171, 172, 173, 19 N.W. 972, 973. Restatement, Torts § 529: "A statement in a business transaction which, while stating the truth so far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation."

one who is prospectively going to extend credit to the concern inquired about.

■ The other incorrect representation alleged to have been made by Fidelity is the statement on the safekeeping receipt that such and such warehouse receipts had been received and placed in the safekeeping file. If Fidelity had a duty to investigate the genuineness of these documents, quite obviously it did not fulfill that duty. Likewise it did not use reasonable care to fulfill this duty, if it existed, because a small amount of inquiry would have revealed whether the distillery had the officers whose names appeared on the notes and receipts and also whether the receipt in fact had been issued by the warehouseman. No such inquiry was made. It is also true that Zanesville could have found out with equal ease and convenience, or at least almost equal ease and convenience, about the genuineness of the documents. So our question becomes: Does a bank, when it takes a document for its safekeeping file for a customer and issues a receipt describing the document, warrant or have a duty to find out about the genuineness thereof?

It would be somewhat surprising to find an affirmative answer to this question. As noted above, Fidelity made but a nominal charge for this safekeeping facility and that nominal charge hardly covered its expenses. It quite obviously was not voluntarily getting itself into a position of warranting the genuineness of documents left with it for safekeeping. An analogy to this situation can be found in letter of credit cases. A bank which pays in good faith against a forged bill of lading can recover from the customer for whom it issued the letter. The bank is under no duty to investigate the genuineness of the shipping document. A leading case is Brown v. C. Rosenstein Co., 1923, 120 Misc. 787, 200 N.Y.S. 491, affirmed without opinion 1st Dept., 1924, 208 App.Div. 799, 203

N.Y.S. 922. See McCurdy, Commercial Letters of Credit, 35 Harv.L.Rev. 715, 734–735 (1922); and Ward and Harfield, Bank Credits and Acceptances 54–55, 93–98 (3d ed. 1948).

We have another analogy in warehouse cases. In Dean v. Driggs, 1893, 137 N.Y. 274, 33 N.E. 326, 19 L.R.A. 302, a warehouseman gave a receipt for " 'fifteen hundred barrels Portland cement.' " The court held the warehouseman not liable to the endorsee of the receipts because the barrels contained a worthless substance. Judge Peckham said: "In its very nature it seems to me plain that no warranty as to contents can reasonably be implied under these circumstances from the use of such language as these receipts contain." 137 N.Y. at page 282, 33 N.E. at page 328. See also Hale v. Milwaukee Dock Co., 1878, 23 Wis. 276. Later cases of this sort are lacking because of the custom of inserting language such as "said to contain" and "contents unknown" in documents of title. See 2 Williston on Sales 582–583 (Rev.ed.1948).

■ We think this is right. We cannot think that either the giver of such a receipt as Fidelity issued here or the person who gets it expects the bailee for safekeeping to warrant the genuineness of the warehouse receipts or to stir about and investigate their validity. It would be easy enough for the issuer of such a receipt to make it read in terms of "documents purporting to be warehouse receipts for whisky and bearing what purports to be the signatures of certain officers," but we do not think that documents issued by the thousands in everyday business, as such things as these must be, must hedge every statement made with the supercaution of a corporate mortgage. Fidelity is not liable either as a warrantor nor as one who had a duty to investigate and failed to perform it.[10]

10. Note that the Uniform Commercial Code specifically limits the warranties of a collecting bank as to documents: "A collecting bank or other intermediary known to be entrusted with documents on behalf of another or with collection of a

The above discussion covers both the liability of the defendant as a "seller" under the Securities Act and also, we think, common law liability in the nature of deceit or for negligence in the use of language.

■ There is also a point made concerning the reference to collateral in the drafts drawn by PAC upon Zanesville. For instance, the draft of July 21, 1950, for $19,000, after the usual date, direction to pay, amount, name of drawee, and so on has this clause: "$19,000 Alexander Young Distilling Co. Collateral Note No. SY–274 dated 7/21/50—due 8/7/50, together with Fidelity-Philadelphia Trust Co. Safekeeping Receipt covering the collateral as fully described on the face of the note." Does that reference make the endorser (that is, Fidelity) a guarantor of the genuineness either of the note or the warehouse receipts which are collateral for the note? This question was raised and decided clearly in the negative in Hubbard Bros. & Co. v. Southern Pac. Co., 5 Cir., 1919, 256 F. 761. To the same effect is the King's Bench decision Guaranty Trust Company of New York v. Hannay & Co., [1918] 2 K.B. 623. See also, discussing the problem, Note, 32 Harv.L.Rev. 560 (1919). We agree with those decisions.

What has been said takes care, either directly or by necessary inference, of the case made by the plaintiff. It has been thoroughly and competently presented for both sides, but we think the defendant should win and that the decision of the lower court was right.

The judgment of the district court will be affirmed.

draft or other claim against delivery of documents warrants by such delivery of the documents only its own good faith and authority. This rule applies even

though the intermediary has purchased or made advances against the claim or draft to be collected." Purdon's Pa. Stat.Ann. tit. 12A, § 7–508.