**RYDER INTERNATIONAL CORPORA-TION, a corporation, Plaintiff,**

v.

**FIRST AMERICAN NATIONAL BANK, a national bank, Defendant.**

**Civ. A. No. CV90–PT–253–M.**

United States District Court,
N.D. Alabama, M.D.

Oct. 10, 1990.

Samuel H. Franklin, & John M. Johnson, Lightfoot Franklin White & Lucas, Birmingham, Ala., for plaintiff.

David B. Anderson and Elizabeth Allen Champlin, Cabaniss Johnston Gardner Dumas & O'Neal, Birmingham, Ala., for defendant.

MEMORANDUM OPINION

PROPST, District Judge.

This cause comes on to be heard on defendant's Motion for Summary Judgment filed on August 10, 1990. The plaintiff has voluntarily dismissed all its claims except those pursuant to § 12(2) of the 1933 Securities Act[1] and § 8–6–19 of the Alabama Blue Sky Law. Both parties acknowledge that the basic elements of the federal and state causes of action are the same and that Alabama courts have looked to federal case law construing § 12(2) in interpreting § 8–6–19.

This case presents interesting legal issues which the parties acknowledge are, to a degree, of first impression.[2] The court is satisfied that the legal issues predominate.[3]

*Facts*

The facts of this case, although extensive, are not as complex with regard to underlying pertinent issues as might appear on first blush. The pertinent facts viewed most favorably (as to *reasonable* inferences) to the plaintiff will follow. The court will not attempt to specifically or accurately state all names, positions, departments, divisions or dates.

Sometime prior to the subject transactions involving the purchase by plaintiff of Integrated Resources (I.R.) commercial paper, plaintiff's management had been contacted (in about 1987) by a representative of the defendant about transferring some of plaintiff's banking business to the defendant. The representative had been previously employed by another bank with which the plaintiff did business.

In the course of the early discussions, it was made known that, from time to time, the plaintiff desired to have its excess cash funds invested in securities which would presumably afford a higher rate of return than mere interest on deposits or Certificates of Deposit. The defendant's repre-

---

1. 15 U.S.C. § 77*l*(2).

2. Particularly as to the securities transactions of banks.

3. The court advised the parties that, if it denied the defendant's Motion for Summary Judgment, it would certify the case for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because the court is satisfied that, under such circumstances, the case would be tailor-made for § 1292(b) consideration.

sentatives stated that it had a "Capital Markets Division" ("Capital") which could obtain such securities. One of the type securities which was discussed was corporate commercial paper. In this regard, the plaintiff's president made it known that he had previously experienced difficulty with similar type investments and that he wanted relatively risk free investments. He specifically made reference to, as was noted by the defendant on its Capital document, "Inquiries and Contacts," a "GMAC benchmark" with reference to commercial paper. There is a reasonable inference that this meant that a general requirement was that commercial paper purchased by plaintiff be of GMAC investment quality or better.[4]

Prior to the subject transactions, I.R. was a loan customer of the defendant. In this connection, certain officers, agents or employees of the defendant in another division than Capital gathered information, which, if not public information, was confidential as between it and I.R. This information was *arguably* negative with regard to its impact on the advisability of purchasing I.R.'s commercial paper.[5] There is no evidence that the Capital division had any knowledge of this information. *After* the loan division had the aforesaid knowledge, the subject commercial paper was purchased by plaintiff through defendant's Capital division.

Plaintiff's liaison officer for dealings with defendant's Capital division was one Wallace Case, its Vice–President of Finance. His contact man at Capital was defendant's employee, Mike Casey. Early in the relationship, plaintiff's president (Ryder) had made known to defendant's agents that defendant "would be dealing with Wallace and I trusted Wallace to look after my interests." Ryder testified in deposition that, he "trust[ed] Wallace Case at that point to make good investments for [the] plaintiff." Further that, at the time of the subject purchases, "Wallace Case [made the ultimate decision as to what commercial paper for Ryder to purchase] within the guidelines that he had."

The two subject purchases of I.R. commercial paper were made on March 20 and April 19, 1989. The two purchases were each in the $200,000.00 range. There is no evidence to rebut evidence that, on the first occasion on which the I.R. commercial paper was purchased, Case called Casey and asked for "rates on 90–day paper for $200,-000.00." [6] Defendant's Capital agent gave Case the rates on several investments, including I.R. paper, other commercial paper, Government obligations and C.D.'s. Case checked the Wall Street Journal for trades in I.R.'s common stock and certain Standard and Poor information and he concluded that I.R. commercial paper "was a good investment at the yield quoted." Case called the defendant and placed an order for the I.R. commercial paper. The April 19 transaction was handled in a similar manner. Case stated that *he* "bought Integrated Resources for 65 days to June 23, probably in comparison to a rate for Deere and Chrysler who are also A2P2 rated." There is no evidence that any agent of the defendant gave Case or any other employee of plaintiff any information concerning I.R. paper other than the rate, yield, Standard and Poor rating, and the maturity date, along with similar information about other securities.[7]

---

4. The defendant's notation is included on a list of "General Requirements" which includes "CP [Commercial Paper] A2P2" and other investment data information which is somewhat illegible. See David Lankford's deposition for clarification.

5. Defendant strongly argues that the information known was not negative and that, indeed, the defendant extended $500,000.00 additional credit to I.R. after having received and analyzed the information. Defendant argues that the information could have been considered in a positive light. The court does not reach the issue of whether it was the type information which, if not illegal to disclose, was material and other-

wise required to be disclosed. *Cf. Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 640–44 (3rd Cir.1989).

6. To the extent that it *might* have a bearing on the "solicitation" issue to be discussed later, the court notes that in some instances the defendant called Case to see if plaintiff wished to reinvest matured investments or simply credit payments to plaintiff's account. This, in and of itself, does not appear to be a "solicitation;" certainly not of the purchase of a specific security.

7. Attached, as Exhibit 1, is Case's undisputed statement, made to his employer, shortly after

In addition to Case, plaintiff had, on a substantial monetary retainer, one Krupp, who monitored plaintiff's financial matters and advised with reference to them. Krupp's deposition reflects, *inter alia*, the following:

Q: And you are presently a business and financial consultant to Ryder?

A: Yes.

*Krupp depo. p. 75:*

Q: Did he [Wallace Case] generally confirm commercial paper purchases to you after you made them?

A: After a certain period of time he sent, as you will see in all those papers, he started sending me copies of all the advices on his investments.

Q. And what period of time was that?

A. Somewhere in '87 or so, maybe early '88. '87, maybe early '88.

*Krupp depo. p. 77:*

Q: Was any part of your job function to monitor the purchases of commercial paper as far as to the wisdom of making any particular purchase?

A. Not particularly.

Q: Did Frank Ryder ever ask you to kind of look at it and make sure Wallace Case was doing a good job?

A: No. It was understood that I was looking at it [Ryder's investments purchased by Case], and even before I started getting the pieces of paper based on other summaries, I knew what he was buying even before he started sending me advices.

\*    \*    \*    \*    \*    \*

*Krupp depo. p. 103:*

Q: Did you have direct authority over Wallace Case? I mean, did you have authority to—

A: No.

Q: —tell him to do or not do something?

A: No. Did I have influence over him? Yes.

Q: But you did tell him with Cayman Islands directly not to purchase anything else in the Cayman Islands?

A: He agreed. He could have said he don't agree with me. He was an officer of the company; I'm not an officer, but he agreed with me that he wouldn't buy it. Telling him not to is a very strong suggestion.

Q: That would be part of your job function though as a financial consultant to the company?

A: Right.

\*    \*    \*    \*    \*    \*

*Krupp depo. p. 349:*

A: ... this [led] to him [Wallace Case] dividing up some of his purchases between First American, and he was buying a substantial portion of his purchases at SouthTrust in order to monitor the rates.

Q. ... so at the same time he was using First American, he was also using South-Trust?

A. ... he eventually started using SouthTrust, also, in an attempt to monitor the rates between the two.

Q. Was that your suggestion?

A. No. That was his [Case] own.

\*    \*    \*    \*    \*    \*

*Krupp depo. p. 136:*

Q: ... Prior to June of 1989 who made the ultimate decision as to what commercial paper for Ryder to purchase?

A: Wallace Case within the guidelines that he had.

\*    \*    \*    \*    \*    \*

*Krupp depo. pp. 98–99:*

Q: And what did you say to him in that conversation when you received the Integrated Resources' confirmation slip?

A: I asked him who Integrated Resources was. I told him I never heard of them.

Q: Right.

A. What kind of company and so, and he said that they were New York listed. I asked if they had a rating, and he said that they were A–2/P–2.

the purchases proved to be ill advised, as to how the purchases were made. There is no evidence to the contrary. There is substantial unrebutted testimony from Case and Casey concerning how the transactions were handled. The court will not repeat it. Basically, the testimony is consistent with Exhibit 1.

I asked him where he came across this company. And he said it was part of the regular pieces of commercial paper that the bank has to offer, and on this particular day when he asked him for several companies, that they gave him Integrated Resources, that he had heard about the company before and he decided to buy it.

After I discussed this with him, I told him that I didn't think this type of company made our criteria, and I didn't think it was advisable that he buy it anymore. It's not that kind of company you could follow on a daily basis. They were primarily in tax shelters, real estate deals. They're recently expanding into various phases of insurance, and it wasn't the type of company like a Ford or a GE or a General Motors that we could say our standards were.

And I thought we had agreed that he would no longer buy an Integrated Resources or any other type of company and he would come back to the standard that we had always referred to.[8]

\* \* \* \* \* \*

*Krupp depo. p. 67:*

Q: Did you ever give or did anyone to your knowledge at Ryder ever give a limit on the rating that a commercial paper could have being purchased by Ryder?

A. Not that I know of.

Q. Would it have been within Ryder's investment criteria to have accepted an A–3 commercial paper, to purchase an A–3 commercial paper?

A. Depends on whose company it is.

*Krupp depo. p. 252:*

Q. So, each of the three companies— General Electric, Sears and Chrysler— would meet a GMAC benchmark, is that correct?

A. In my opinion, for 30 days on this day, they are all the same to me.

Q: Why would you be asking for second line investments if you only wanted the highest quality investments?

A. Checking the market rates.

Q. Which of those—

A. I would also ask for the highest first line.

Q. Yes, sir. I understand that. Were any of those companies second line [A2 or P2] that you know of?

A. Chrysler is second line.

\* \* \* \* \* \*

*Krupp depo. pp. 41–42:*

Q: You would consider Chrysler today to be a risk free investment?

A: Yes.

Q: Are you aware of what the rating is for Chrysler today?

A: Third line.

Q: And so you believe that A–3 paper, Chrysler A–3 paper would be a risk free investment on a short term basis?

A: On a short term basis I would consider Chrysler today to be risk free in the category that we're trying to describe anything as being risk free.

\* \* \* \* \* \*

There is no dispute that, at the time each I.R. transaction was closed, I.R. commercial paper was A2 rated.[9] At oral argument the plaintiff acknowledged that, in the absence of holding the defendant accountable for the alleged negative information its loan department had, the plaintiff could not likely sustain a position that the purchase of the I.R. commercial paper provides the basis for a § 12(2) violation by the defendant.

The court will leave it to the parties to fill in perceived gaps as to detailed factual information. The court has fully considered all the allegations of both parties. Basically, the court concludes that the pertinent factual data is that related to whether the defendant was a "seller" of the commercial paper (to which the court will return), whether the defendant "solicited" the purchases (to which the court will return) and whether, if the defendant was a "seller" or "solicitor," the defendant had a

---

**8.** Here, Krupp makes reference to a conversation with Case after he made the March 20 purchase.

**9.** A2 apparently is a Standard & Poor rating. P2 is a comparable Moody's rating. Moody apparently did not rate I.R. commercial paper.

duty to impart the knowledge its loan department had to the plaintiff's agent.[10]

## Applicable Law

The parties seem to agree that the law applicable to this case was enunciated in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Although *Pinter* construes § 12(1) of the 1933 Act rather than § 12(2), several Circuit Courts of Appeal have subsequently applied *Pinter's* principles to § 12(2) claims. The Eleventh Circuit has not re-visited the issue, in the light of *Pinter*, since *Foster v. Jesup and Lamont Securities Co., Inc.*, 759 F.2d 838 (11th Cir.1985). This court concludes that the Eleventh Circuit, like the other Circuits, would follow *Pinter* in § 12(2) cases.[11]

The initial decision this court must make, pursuant to *Pinter*, is whether there is any reasonable inference that the defendant here was a "seller" or "offeror" of the commercial paper. Ironically, *Pinter* states that the determination of who is a "seller" or "offeror" under § 12 is an "area that demands certainty and predictability." 486 U.S. at 652, 108 S.Ct. at 2081. Respectfully, this court suggests that *Pinter* does not fully satisfy its own precept. This court will do the best it can to find the desired "certainty and predictability" from *Pinter* and other cases. The following statements in *Pinter* provide the only guidance on the issue.

... But the Securities Act nowhere delineates who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue. The courts, on their part, have not defined the term uniformly.

At the very least, however, the language of § 12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity. Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value. See Loss, at 1016. Dahl of course, was not a seller in this conventional sense, and therefore may be held liable only if § 12(1) liability extends to persons other than the person who passes title.

In common parlance, a person may offer or sell property without necessarily being the person who transfers title to, or other interest in, that property. We need not rely entirely on ordinary understanding of the statutory language, however, for the Securities Act defines the operative terms of § 12(1). Section 2(3) defines "sale" or "sell" to include "every contract of sale or disposition of a security or interest in a security, for value," and the terms "offer to sell," "offer for sale," or "offer" to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3). Under these definitions, the range of persons potentially liable under § 12(1) is not limited to persons who pass title. The inclusion of the phrase "solicitation of an offer to buy" within the definition of "offer" brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12.

**10.** Another issue is whether Krupp's unfollowed advice to Case was an independent intervening factor as to the April 19 purchase.

**11.** *Pinter* itself acknowledged that most courts have defined the class of defendants under § 12(2) as being the same as under § 12(1). While the court did not decide the issue with respect to § 12(2), the language at 486 U.S. pp. 648–652, 108 S.Ct. pp. 2079–81 forecloses any reasonable possibility that *Foster's* "substantial factor" analysis can survive. In any event, it would appear to be ludicrous to suggest that "offers or sells" means one thing in § 12(1) and another in § 12(2) which immediately follows it. Both sections contain the same concluding phrase(s). Post *Pinter* cases which have applied its language to § 12(2) include: *Abell v. Potomac Ins. Co.*, 858 F.2d 1104 (5th Cir.1988); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531 (9th Cir.1989); *Capri v. Murphy*, 856 F.2d 473 (2d Cir.1988); *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011 (2d Cir.1989); *Wilson v. Saintine Explor. & Drilling Corp.*, 872 F.2d 1124 (2d Cir.1989); *Crawford v. Glenns, Inc.*, 876 F.2d 507 (5th Cir.1989); and *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628 (3rd Cir.1989). None of these cases give this court much additional guidance over and above that in *Pinter* in determining whether the defendant here was a "seller" or "offeror." This court does not suggest that a "substantial factor" analysis would lead to a different conclusion.

See Loss, at 1016; Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 206–207 (1933). Indeed, the Court has made clear, in the context of interpreting § 17(a) of the Securities Act, 15 U.S.C. § 77q(a), that transactions other than traditional sales of securities are within the scope of § 2(3) and passage of title is not important. See *United States v. Naftalin*, 441 U.S. 768, 773 [99 S.Ct. 2077, 2081, 60 L.Ed.2d 624] (1979). We there explained: "The statutory terms ["offer" and "sell"], which Congress expressly intended to define broadly, ... are expansive enough to encompass the entire selling process, including the seller/agent transaction." *Ibid.* See also *Rubin v. United States*, 449 U.S. 424, 430 [101 S.Ct. 698, 701, 66 L.Ed.2d 633] (1981) ("It is not essential under the terms of the Act that full title pass to a transferee for the transaction to be an 'offer' or a 'sale' ").

Determining that the activity in question falls within the definition of "offer" or "sell" in § 2(3), however, is only half of the analysis. The second clause of § 12(1), which provides that only a defendant "from" whom the plaintiff "purchased" securities may be liable, narrows the field of potential sellers. Several courts and commentators have stated that the purchase requirement necessarily restricts § 12 primary liability to the owner of the security. *E.g.*, *Beck v. Cantor, Fitzgerald & Co.*, 621 F.Supp. 1547, 1560–1561 (ND Ill.1985); Abrams, The Scope of Liability Under Section 12 of the Securities Act of 1933; "Participation" and the Pertinent Legislative Materials, 15 Ford. Urban L.J. 877 (1987); see also *Collins v. Signetics Corp.*, 605 F.2d 110, 113 (CA3 1979) (absent some "special relationship"—*e.g.*, control—§ 12 requires privity between statutory seller and buyer). In effect, these authorities interpret the term "purchase" as complementary to only the term "sell" defined in § 2(3). Thus, an offeror, as defined by § 2(3), may incur § 12 liability only if the offeror also "sells" the security to the plaintiff, in the sense of transferring title for value. Abrams, 15 Ford. Urban L.J., at 922–923.

We do not read § 12(1) so restrictively. The purchase requirement clearly confines § 12 liability to those situations in which a sale has taken place. Thus, a prospective buyer has no recourse against a person who touts unregistered securities to him if he does not purchase the securities. Loss, at 884. The requirement, however, does not exclude solicitation from the category of activities that may render a person liable when a sale has taken place. A natural reading of the statutory language *would include* in the statutory seller status at least *some persons who urged* the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title. See *Cady v. Murphy*, 113 F.2d 988, 990 (CA1) (finding broker acting as agent of the owner liable as a statutory seller), *cert. denied*, 311 U.S. 705 [61 S.Ct. 175, 85 L.Ed. 458] (1940). The Securities Act does not define the term "purchase." The soundest interpretation of the term, however, is as a correlative to both "sell" and "offer," at least to the extent that the latter entails *active* solicitation of an offer to buy. This interpretation is supported by the history of the phrase "offers or sells," as it used in § 12(1). An enacted in 1933, § 12(1) imposed liability on "[a]ny person who ... sells a security." 48 Stat. 84. The statutory definition of "sell" included "offer" and the activities now encompassed by that term, including solicitation. *Id.*, at 74. The words "offer or" were added to § 12(1) by the 1954 amendments to the Securities Act, when the original definition of "sell" in § 2(3) was split into separate definitions of "sell" and "offer" in order to accommodate changes in § 5. 68 Stat. 683, 686. Since "sells" and "purchases" have obvious correlative meanings, Congress' express definition of "sells" in the original Securities Act to include solicitation suggests that the class of those from whom the buyer "purchases" extended to persons

who solicit him. The 1954 amendment to § 12(1) was intended to preserve existing law, including the liability provisions of the Act. H.R.Rep. No. 1542, 83d Cong., 2d Sess., 26 (1954); S.Rep. No. 1036, 83d Cong., 2d Sess., 18 (1954); Loss, at 884. Hence, there is no reason to think Congress intended to narrow the meaning of "purchased from" when it amended the statute to include "solicitation" in the statutory definition of "offer" alone.

The applicability of § 12 liability *to brokers and others who solicit* securities purchases has been recognized frequently since the passage of the Securities Act. It long has been "quite clear," that when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller.

\*  \*  \*  \*  \*  \*

An interpretation of statutory seller that includes brokers and others who solicit offers to purchase securities furthers the purposes of the Securities Act—to promote full and fair disclosure of information to the public in the sales of securities. In order to effectuate Congress' intent that § 12(1) civil liability be *in terrorem,* see Douglas & Bates, 43 Yale L.J., at 173; Shulman, 43 Yale L.J., at 227, the risk of its invocation should be felt by solicitors of purchases. The solicitation of a buyer is perhaps the most critical stage of the selling transaction. It is the first stage of a traditional securities sale to involve the buyer, and it is directed at producing the sale. In addition, brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, *such persons are the participants in the selling transaction who most often disseminate material information to investors.* Thus, solicitation is the stage at which an investor is most likely to be injured, that is, *by being persuaded* to purchase securities without full and fair

information. Given Congress' overriding goal of preventing this injury, we may infer that Congress intended solicitation to fall under the mantle of § 12(1).

Although we conclude that Congress intended § 12(1) liability to extend to those who solicit securities purchases, we share the Court of Appeals' conclusion that Congress did not intend to impose rescission based on strict liability on a person who *urges* the purchase but whose motivation is solely to benefit the buyer. When a person who *urges* another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer "purchased" from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as "soliciting." Section 2(3) defines an offer as a "solicitation of an offer to buy ... for value." The person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale. The language and purpose of § 12(1) suggest that liability extends only to the person *who successfully solicits* the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him and to align him with the owner in a rescission action.

(Emphasis added). (Footnotes omitted). 486 U.S. 642–647, 108 S.Ct. at 2076–79.

In support of its contention that the defendant was a "seller," plaintiff notes the following evidence. The "Customer Confirm/Advice," dated March 20, 1989, prepared by the defendant, states: "As *Agent* We Have *Sold* To You" (emphasis added). The April 19, 1989 document of the same title states the same. Plaintiff also notes that Capital's Vice–President and Compliance Officer testified that defendant purchased the paper and sold them to plaintiff at a higher price.[12]

---

**12.** A full reading of Lankford's deposition makes it plain that he did not intend to use the term "sale" as a term of art; certainly not as interpreted under § 12. Many of the responses were to leading questions. Defendant's counsel objected to many of the questions as to "form" on the basis of the characterization of the trans-

The court begins its analysis of the "seller" issue with the conclusion that, in the making of such determinations, form should not be exalted over substance, either way.[13] Just as a firm disavowal of being a "seller" would not preclude the determination that one is a "seller," the use of a document which uses the term "sold" is likewise not decisive. The substance of the transaction should control.

Defendant, being a bank, was, of course, limited in the type securities transactions it could engage in.[14] This court cannot better state those limitations and the nature of defendant's Capital division business than they are stated in *Securities Industry Association v. Board of Governors,* 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984). Under the applicable law, as discussed in *Securities Industry,* the defendant could not have legally been a "seller" or "offeror" as is contemplated by § 12(2).[15] As noted in *Securities Industry,* the bank's business was "essentially confined to the purchase and sale of securities for the account of third parties, and without the provision of investment advice to the purchaser or seller." 468 U.S. at 212, 104 S.Ct. at 3006.[16]

This court sees no evidence that creates a reasonable inference that the defendant violated the laws discussed in *Securities Industry.* The substantial undisputed evidence is to the contrary. Other than some

conclusory references to "sold" in depositions and in the noted document, the transactions were clearly not transactions in which the defendant was a § 12(2) "seller." There is no evidence which creates a reasonable inference that the defendant was the agent of I.R. or Drexel.[17] On the other hand, the evidence is overwhelming that the defendant was the agent of the plaintiff.

The paper was "bearer" paper. It was not ever registered in the name of plaintiff or defendant. In both instances, the purchase order placed by plaintiff preceded the purchase by the defendant on behalf of the plaintiff. Unlike in some such transactions, the trade dates and the settlement dates were the same. This suggests that there was never any ownership by the defendant. At the time the plaintiff placed the order the defendant certainly did not own the paper.

The defendant clearly acted as a "broker," not as an "owner" or a "dealer." As stated in *Securities Industry, supra,* "As broker, the [bank] buys and sells securities as agent for the account of customers. In these transactions, it is the customer, rather than the [bank] who bears the risk of loss." 468 U.S. at 218, note 18, 104 S.Ct. at 3009, note 18.[18] The case further notes that "a broker executes orders for the purchase or sale of securities solely as agent."

actions in the questions. While plaintiff argues that "at the very least, there is a genuine issue of material fact as to whether Ryder took title to the notes directly from First American thus precluding summary judgment on this point," where, as here, the underlying facts are not in material dispute, it would be ludicrous to allow the jury to make the legal decision of whether defendant was or was not a seller. Either way, the issue is one of law. Any other approach would be a "cop out." The substantive aspects of the transactions are not disputed.

13. This court recently noticed that the North Carolina motto is *"esse quam videri* (to be rather than seem)." There is a modern trend to the contrary in all walks of life. A contrary motto is often applicable to trials. Almost totally "dead" in court are the Latin phrases *"mea culpa"* and *"damnum absque injuria."*

14. Defendant has not argued that the commercial paper here (notes) were not "securities" subject to § 12(2).

15. The court is aware that any such illegal transactions, if they occurred, would not likely shield defendant from a § 12(2) claim. *Cf. Goldberg v. Bear Stearns & Co., Inc.,* 912 F.2d 1418 (11th Cir.1990). On the other hand, in the absence of substantial evidence to the contrary, there is a reasonable inference that the transaction was intended to be in compliance with banking law.

16. *See also* note 8, 468 U.S. at pages 212 and 215, 104 S.Ct. at 3006 and 3008.

17. A reasonable inference does not arise merely because the careless use of terms might persuade a lay jury. Juries are not entitled to draw irrational, emotional or merely expedient inferences.

18. "Bearing risk of loss" is one of the criteria for determining ownership and thus, "passage of title."

*Id.* at 218, 104 S.Ct. at 3009. The court notes that the opinion also states that "BAC [the bank] has no 'salesman's stake' in the ... trades." *Id.* at 220, 104 S.Ct. at 3011. Further, that "the business of purchasing or selling securities upon the unsolicited order of and as agent for a particular customer, does not constitute the 'public sale' of securities for purposes of section 20." *Id.* at 221, 104 S.Ct. at 3011.[19]

*Pinter* recognizes that, in some instances, brokers may be "sellers" under § 12(2). First, if the broker is the agent of the selling owner. There is no such evidence here. Second, if the broker "solicits" the purchase. The court will return to that issue.

A number of cases have recognized that brokers such as the defendant are not "sellers" under the provisions of § 12(2).[20] In *Canizaro v. Kohlmeyer & Co.,* 370 F.Supp. 282, 287 (E.D.La.1974), the court stated:

> But "when the broker represents the buyer alone and executes a purely *unsolicited* order, it is difficult to see how he could be considered one who 'sells' even within the meaning of the Securities Act." III Loss, Securities Regulation 1714 (2d Ed.1961). (Emphasis in original).
>
> \*   \*   \*   \*   \*   \*
>
> ... First, we do not believe that Kohlmeyer & Company's actions constitute "offering" or "selling" as these words are used in their more traditional sense for although Kohlmeyer & Company's name appears on the confirmation slip as principal, this was done merely as a bookkeeping measure. Kohlmeyer & Company acted solely as Canizaro's agent or representative in the transaction—it neither purchased the stock for

its own account nor sold the stock out of its own inventory. Furthermore, Kohlmeyer had had no prior relationship with HCF and had never before dealt in HCF stock. The only profit it made on the transaction was a commission well within the bounds set by the NASD. Thus, the fact that Kohlmeyer & Company's name appears as principal on the confirmation standing alone does not make it a "seller."

This court will not further quote from *Canizaro* but recommends a full reading of it with reference to the "seller" issue and other issues in this case. This court notes that the reference to "principal" in *Canizaro* is comparable to the "sold" notations on the confirmation documents in this case.[21]

In another pre-*Pinter* case, *Lawler v. Gilliam,* 569 F.2d 1283, 1288 (4th Cir.1978), the court held that "[§ 12] [l]iability may be imposed on any person who actively solicits an order, participates in the negotiations, or *arranges* the sale." (Emphasis added). This language may be a relic of the "substantial factor" era. *Lawler* goes on to say, even under the arguably more inclusive "substantial factor" analysis that, "In contrast, the definition *excludes persons who execute an unsolicited order* or whose minor role in the transaction shows that they have no causal transaction with it." (Emphasis added).

In *Craighead v. E.F. Hutton & Co., Inc.,* 899 F.2d 485, 493 (6th Cir.1990), the court, in discussing the meaning of "seller" under the 1933 Securities Act, states, "Brokers have been held, liable as 'sellers' only in those cases where they were closely aligned with the title-holding parties or worked as agents of the securities issuers." (*citing Pinter,* 486 U.S. at 645, 108 S.Ct. at

---

**19.** Of course, section 20 is not directly applicable here.

**20.** *Pinter* suggests that the type "sales" contemplated by *Pinter* arise out of a "buyer-seller relationship not unlike *traditional* contractual privity." (emphasis added). It is not clear whether *Pinter's* later extension beyond the *traditional* relationship results from an expansive interpretation of "sells" or strictly from an interpretation of "offers," and, thus, "solicitor."

**21.** If *Quincy Co-operative Bank v. A.G. Edwards & Sons, Inc.,* 655 F.Supp. 78 (D.Mass.1986), another pre-*Pinter* case, purports to be contrary to *Canizaro,* this court rejects *Quincy. Quincy* is easily distinguishable from this case in that Edwards' employee actively suggested the purchase of specific bonds. Edwards may have been a dealer as well as a broker. The defendant here was not a dealer. For a discussion of the distinction between "brokers" and "dealers," see Douglas & Bates, *Stock "Brokers" As Agents and Dealers,* 43 Yale Law Journal 46 (1933).

2077–78 and other cases). This court also notes the discussion in *Beck v. Cantor, Fitzgerald & Co., Inc.*, 621 F.Supp. 1547, 1560–62 (D.C.Ill.1985). *See also Strong v. Paine Webber, Inc.*, 700 F.Supp. 4 (S.D.N.Y.1988); *Merrill Lynch, et al. v. Cheng*, 697 F.Supp. 1224 (D. of D.C.1988); and *Leonard v. Shearson Lehman/American Express, Inc.*, 687 F.Supp. 177 (E.D.Pa. 1988).

Particularly persuasive is the following language in *First Trust & Savings Bank v. Fidelity–Philadelphia T. Co.*, 214 F.2d 320 (3rd Cir.1954) *cert. denied*, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 674 (1954):

> It should be noted that what was done here is very similar to what goes on in thousands and thousands of cases where a bank advances funds to its customer upon having endorsed to it the customer's draft on a third party, accompanied by a negotiable bill of lading or warehouse receipt.

214 F.2d at 322.

> \*　　\*　　\*　　\*　　\*　　\*

> If this set of facts constitutes Fidelity a seller under the Securities Act, it seems to us inevitable that every bank which advances money to a customer upon a sight draft and negotiable bill of lading is also a seller.

> \*　　\*　　\*　　\*　　\*　　\*

> Fidelity did not urge by intimation or express statement that Zanesville should act upon the information.

> \*　　\*　　\*　　\*　　\*　　\*

> Furthermore, it can hardly be denied that when a bank takes a document for collection advancing to its customer credit prior to the actual collection being made, the bank then becomes at least a security owner.

> \*　　\*　　\*　　\*　　\*　　\*

> And when it endorses the instrument, on which it thus advanced credit, to another bank by the general endorsement "pay any bank, banker or trust company," and gets its money, has it not passed its interest in that document along to him

who pays the draft and gets the supposedly valuable bill of lading, warehouse receipt or note accompanying the draft? And if that is so, why have we not been pushed into the startling conclusion that every bank that makes an advance on an instrument left with it for collection, and passes that instrument on to someone else, has become a seller under the terms of the federal statute, if the transaction is one in interstate commerce?

> We think that we do not need to reach this *startling conclusion*, at least on the facts of this case.

(emphasis added). 214 F.2d at 323.

> Nor it is true that to become a "seller" under the Securities Act one does not have to be the owner of that which he "sells." A broker can, under some circumstances, become a "seller." *Cady v. Murphy*, 1 Cir., 113 F.2d 988, *certiorari denied*, 1940, 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458, (seller's broker); *Boehm v. Granger*, 1943, 181 Misc. 680, 42 N.Y. S.2d 246, affirmed without opinion, 1st Dept., 1944, 268 App.Div. 855, 50 N.Y. S.2d 845 (buyer's broker). On the other hand, Professor Loss says that there are various kinds of mechanical activities which do not come under the statute and his extensive experience in this field gives his view importance, especially in the absence of case law to the contrary.

214 F.2d at 324.

§ 12(2) states that a "seller" "shall be liable to the person purchasing such security from him." Plaintiff clearly did not purchase the paper from the defendant.[22] Buying something for someone as his agent is not tantamount to selling it to him. The court concludes that the defendant was not a "seller" under the provisions of § 12(2). This determination does not, however, conclude the court's consideration. As *Pinter* makes clear, one need not be a "seller" to fall under § 12(2). The court must next decide if defendant was an "offeror" or "solicitor."

It would appear that the term "offeror" includes anyone who, although not an own-

---

22. In *Abell v. Potomac Insurance Co.*, 858 F.2d 1104, 1114 (5th Cir.1988) and *Crawford v. Glenns, Inc.*, 876 F.2d 507, 510 (5th Cir.1989), the court poses the question "from whom did the plaintiff ... [buy the security?]" Here, the plaintiff did not buy the security from the defendant. It bought it *through* the defendant.

er or seller, in some fashion "solicits" the purchase. *Pinter* suggests that the defendant here was not such a "solicitor." There is no evidence that the defendant "urged" or "persuaded" or otherwise influenced plaintiff to purchase these particular securities.[23] Surely it cannot be intended that the mere general solicitation of business of this type constitutes "solicitation" as contemplated by *Pinter*. If so, as is suggested in *First Trust & Savings, supra,* every bank which does such business would automatically be a "solicitor" covered by § 12(2) as to every such transaction. There is no reason to think that a bank, which is not allowed to "solicit" security purchases within the context of the laws discussed in *Securities Industry, supra,* is a "solicitor" under § 12(2) if it acts consistently with those laws. All brokers generally solicit business. Charles Schwab & Co., discussed in *Securities Industry,* whose business Bank of America was purchasing, certainly did and does. Such general solicitation of business does not convert a broker into a § 12(2) "seller" "offeror" or "solicitor."[24] Nor does the fact that defendant was paid slight commissions for the transactions change its status.[25] *Pinter* provides that the person sought to be charged must *solicit and* be "motivated at

least in part by a desire to serve his own financial interests...." In the aptly entitled, *"Would Someone Please Tell Me The Definition Of The Term 'Seller': The Confusion Surrounding Section 12(2) Of The Securities Act of 1933?",* 14 Del.J.Corp.L. 35, Joseph E. Reece[26], 1989, the author states that *Pinter* creates a two-prong solicitation test. "First, whether the participant in the sale 'solicited' the purchase; and second, whether the participant or the owner of the security sold benefited."[27] He also states, *"Pinter* apparently requires someone to be an issuer or a paid participant who actually contacted a buyer and *urged* the buyer to purchase before such participant would meet the first prong of the solicitation test." (Emphasis added).[28] Obviously, Schwab charges commissions. All brokers do. That it does is not the determining factor either way. One may be a solicitor even if it doesn't receive a commission as such. *Katz v. Amos Treat & Co.,* 411 F.2d 1046 (2d Cir.1969).[29]

Reduced to its essence, plaintiff's claim is, as stated in the last two sentences of Section III of its brief, "Based on its knowledge of Ryder's investment philosophy, First American had a duty not to offer Integrated Resources notes to Ryder. Moreover, First American had a duty fully

---

**23.** In *Crawford v. Glenns, Inc., supra,* the court uses the terms "promotes or solicits" as if they have similar meanings. The court also notes that "Yerger made no affirmative recommendation or suggestion to buy to the purchaser." 876 F.2d at 511. In *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 636 (3rd Cir.1989), the court stated:

> *See Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 536–37 (9th Cir.1989) (mere performance of professional services without active solicitation of the purchase does not give rise to § 12(2) liability); *Wilson,* 872 F.2d at 1127 (one who prepares documents for offering is § 12(2) seller for persuading client to make particular investment); *Abell,* 858 F.2d at 1114 & n. 8 (issuers are sellers to extent they utilize a system analogous to that of automobile manufacturers; that is, to the extent they create distribution chains and engage in intensive marketing to convince public to purchase their securities; *Capri,* 856 F.2d at 478–79 (defendant who played major role in setting up venture is not a § 12(2) seller unless plaintiffs can show defendant actually solicited their investment)....

**24.** To so hold would expose banks to "hazards" which the banking laws discussed in *Securities Industry* seek to avoid. Interestingly, this court's law clerk was unable to find any § 12 cases against Charles Schwab & Co.

**25.** $151.00 for one transaction; $125.00 for the other.

**26.** SEC attorney.

**27.** The *Pinter* court rejected an argument "that persons who 'participate in the soliciting purchase' may be liable as statutory sellers." 486 U.S. at 651, n. 27, 108 S.Ct. at 2081, n. 27.

**28.** Plaintiff admits that "Ryder is the only customer of First American holding commercial paper issued by Integrated Resources when the default occurred, and indeed First American had sold none of that issuer's commercial paper to anyone else between January 1, 1988 and the first sale made to Ryder." If anything, this belies the fact that defendant was aggressively selling the paper or urging purchases of it.

**29.** Presumably, after *Pinter,* there would have to be some benefit to somebody.

to disclose all information relevant to the quality of the commercial paper it offered to Ryder." Even assuming that such a "duty" existed, this "duty" did not make the defendant a "seller," "offeror," or "solicitor." The court cannot put the cart before the horse, when there is no horse. Plaintiff's designation of defendant as an "offeror," within the context of § 12(2), is not supported by the facts. Merely providing financial information concerning the available commercial paper for sale by others did not make the defendant an "offeror" or "seller" under § 12(2). Neither did the mechanical act of executing an order. The court concludes that defendant was not an "offeror" or "solicitor."

The court having concluded that the defendant was neither a seller, offeror or solicitor, plaintiff cannot recover and defendant is entitled to summary judgment. The court will, however, at least allude to other issues which, hopefully, the parties and the appellate court(s) will address on appeal in the event this court's judgment is reversed.[30]

The next issue would be, if defendant was in the class of defendants contemplated by § 12(2), whether defendant, through its Capital division, was guilty of a misleading omission of information which it knew or in the exercise of reasonable care could have known.[31]

This inquiry spawns several more questions. First, did the Capital division of defendant have any duty to make inquiry to the loan department? Second, could the Capital division have legally made inquiry to the loan departments? Third, did the loan officials have any duty or legal right to convey to the Capital division the information that it had? Was it "insider" information? Was it confidential?[32] Fourth, was the information which the loan officials had material?[33] Among the cases which may bear on the legality of any such disclosures are: *Cotton v. Merrill Lynch, et al.,* 699 F.Supp. 251 (N.D.Okl.1988) and *Slade v. Shearson, Hammill & Co., Inc., et al.,* New Court Decisions, CCH, (S.D.N.Y.1974).

Plaintiff argues that if the defendant could not reveal confidential information from another division to Capital, the defendant had a duty not to sell I.R. paper at all. Whether this is true or not, the violation of any such alleged duty would not be a violation of § 12(2) by its terms.[34] Plaintiff also makes an *ipse dixit* argument that "First American, having chosen to offer paper issued by one of its customers, thereby knowingly took on the duty to assemble and disclose all information known to it about the issuer that would be important to the purchaser." No persuasive, and certainly no controlling, authority is cited for this proposition. In any event, this "claim" is *ultra* statute.

Further, even if the bank could legally consider the information, and, even if one

---

**30.** The court recognizes the possible ephemeral nature of its judgment. The task of this court is demonstrated by the fact that the Supreme Court rejected the "substantial factor" analysis after numbers of lower courts had adopted it in interpreting the same statutory language.

**31.** Plaintiff has argued that there was an "implied misrepresentation." The statute refers to *"untrue" statements.* In any event, if there was no "omission," there was no "implied misrepresentation." The court rejects this argument and will not discuss the cases which plaintiff purports to rely on. Some are obviously distinguishable. Some cases cited by plaintiff involve "dealers," not "brokers." In at least one of plaintiff's "implied misrepresentation" citations, the court simply stated that "where a broker-dealer makes a representation as to the quality of the security he sells, he impliedly represents that he has an adequate basis in fact for the opinion he renders." *Franklin Sav. Bank of*

*New York v. Levy,* 551 F.2d 521, 527 (2d Cir. 1977). Defendant here expressed no such "opinion."

**32.** For Tennessee law on confidentiality of bank records, see Tennessee Code § 45–10–101, *et seq.* Plaintiff argues that § 7–1–201(27) Code of Alabama 1975 (UCC) creates or impacts on a duty to disclose.

**33.** The court will leave it to the parties to develop the facts related to this issue. *Cf. Schneberger v. Wheeler,* 859 F.2d 1477 (11th Cir.1988). *See also In re Union Carbide Class Action Securities,* 648 F.Supp. 1322 (S.D.N.Y.1986). This court has not considered whether 10(b)(5) omission cases are pertinent.

**34.** It doesn't appear to proscribe the purchasing of the securities of a loan customer on behalf of another customer.

division should have secured the information from the other, there is a question as to whether the information would have been such as to "make the statements made misleading." The only possible "statement" which could thus be considered "misleading" would be the "Standard & Poor" rating. Would the rating have been affected? Was the rating thus misleading? This court will not further develop that issue.

Another possible issue is whether Krupp's caveat to Case after the first purchase was an independent intervening factor which entitles defendant, in any event, to summary judgment as to the second purchase. Did it lessen the claimable damages?

Another issue is whether the evidence concerning the payment of $250.00 per quarter to Case is relevant or, if so, more prejudicial than probative.[35] This court leans toward feeling that it would be inadmissible at a trial. An appropriate Judgment will be entered.

EXHIBIT 1

RYDER INTERNATIONAL
CORPORATION

INTEROFFICE MEMO

TO: File

FROM: Wallace Case

DATE: June 21, 1989

COPIES TO:

SUBJECT: INVESTMENT IN INTE-GRATED RESOURCES

There are two principal ways we buy short term papers:

1. The bank, on a maturity date, will call early in the morning (around 9 o'clock central time) to see whether we wish to reinvest it or have it credited to our account.

2. I invest "new" excess funds when we have funds beyond what will be needed to pay our bills.

In the case of the purchase on March 20 of Integrated Resources (for $200,000, discounted) we had excess funds. I called the bank and asked for our investment officer, to check the rates on 90–day paper for $200,000. A little later he called back and offered the rates on several investments, probably including (although I do not have the exact offerings of that date) General Motors Acceptance, Chrysler (if it was still open), Integrated Resources, and quoted rates for Gov't obligations and discounted bank C.D.s. I then checked the Wall Street Journal for trades in Integrated's common stock. I checked the Stock Guide published by Standard & Poor's, which lists all of the assets and liabilities of the most recent balance sheet date (copies also in the files) and determined that for a 90–day period of time, this was a good investment at the yield quoted. I called the bank back and placed an order for the Integrated Resources.

About mid April, it appeared that we would need extra funds at the end of June, so on April 19, when $300,000 of short term investment matured, I rolled over $200,000 into a new investment. In this case, the broker would have called me at about 9 o'clock in the morning to tell me I had a maturity. I would have asked him to check rates and then he would have called me back. At this time, I bought Integrated Resources for 65 days to June 23, probably in comparison to a rate for Deere and Chrysler who are also A2P2 rated.

---

**35.** Case's salary with plaintiff was $80,000.00      per year.